Filed 6/3/13; pub. order 6/26/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of JOANN and LYLE B. GREENWAY. | |
| JOANN GREENWAY,<br><br>    Appellant,<br><br>        v.<br><br>LYLE B. GREENWAY,<br><br>    Respondent. | G045949<br><br>(Super. Ct. No. 10D005024)<br><br>O P I N I O N |

        Appeal from an order of the Superior Court of Orange County, Thomas R. Murphy, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

        Law Offices of William J. Kopeny and William J. Kopeny for Appellant.

        Law Offices of Marjorie G. Fuller and Marjorie G. Fuller for Respondent.

After 48 years of marriage, Lyle B. Greenway (Lyle) sought legal separation from Joann Greenway (Joann).[1]  At first, Joann filed a response also seeking legal separation, but later she objected to ending the marriage or dividing the estate valued at several million dollars.  She asserted Lyle was mentally incompetent and their son, Kurt Greenway (Kurt) was controlling the situation.  The parties agreed to have the matter heard by retired judge Thomas R. Murphy on the sole issue of whether Lyle was capable of making a reasoned decision regarding his marital status.  The trial court reviewed written arguments and heard testimony from Lyle, Joann, their three adult children, Lyle's elder law attorney, the family accountant, and four health care professionals who had evaluated and assessed Lyle's mental state.  The court determined Lyle was mentally capable of making a reasoned decision to end his marriage.  The court granted Lyle's request for status-only dissolution of his marriage to Joann.

On appeal, Joann asserts:  (1) the record does not contain sufficient evidence that irreconcilable differences resulted in an irremediable breakdown of the marriage; (2) there was insufficient evidence Lyle had the capacity to understand the meaning of the concepts critical to the dissolution of a marriage; and (3) the court's conclusions regarding Lyle's dementia are not supported by substantial evidence.  We conclude Joann's arguments lack merit, and we affirm the court's ruling.

II

Lyle and Joann were married on August 19, 1961.  They have three adult children, Nick Greenway (Nick), Kurt Greenway (Kurt), and Lyle Greenway, Jr., (hereafter referred to by his nickname "Guy" to avoid confusion).

---

[1]  "As is customary in family law proceedings, we refer to the parties by their first names for purposes of clarity and not out of disrespect.  [Citations.]"  (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

2

On May 28, 2010, Lyle, a 76-year-old retired dentist filed a petition for legal separation, declaring under penalty of perjury his request was based on irreconcilable differences. He was represented by counsel.

Joann, 72-years-old, was served with the summons and petition on June 2, 2010. After Lyle granted her an extension, on July 15, 2010, Joann (representing herself) filed a response also requesting legal separation based on irreconcilable differences. She confirmed the date of separation was May 27, 2010.

The following month, Lyle requested trial preference on the basis of his age and failing health. He filed a declaration stating he moved out of the family residence in 2009, and was living alone in the Newport Beach Plaza Retirement Community (Newport Beach Plaza). On July 2, 2010, he was hospitalized due to a knee infection that required surgery. Lyle stated he was currently recovering in a skilled nursing facility. Lyle stated his recovery had been hampered because his immune system was weakened by the chemotherapy treatments he received to treat lymphoma. Lyle noted Joann was taking too long to complete the paperwork and needed to move forward with the case. She was given an extension to file her response, and she had not yet completed a preliminary declaration of disclosure.

Lyle declared, "I would like my legal separation case over as quickly as possible because I fear that due to my failing health, I may not make it much longer, or that something will happen to me which prevents me from fully participating in these proceedings. [Joann] has tried to control my health care decisions since I was admitted to the hospital . . . despite the fact that she does not have the ability to do so. I have an advanced health care directive [in place since November 20, 2009] as I do not want [Joann] trying to control my health situations. . . . I believe that [Joann] will assert herself in any manner possible in this litigation that is to my detriment. [She] has a way of trying to control every situation I am in and I fear that I may not be able to protect myself in these proceedings should something else happen to my health. I have a

3

substantial interest in my legal separation case and want to protect myself by making sure I can actively participate in my case."

In September 2010, Joann (now represented by counsel), filed an amended response claiming the parties were not separated and objecting to legal separation or dissolution of the marriage. She also opposed the motion for trial preference. She alleged Lyle was not seeking legal separation or trial preference "knowingly or of his own volition." She stated, "I believe the foregoing actions were conceived and orchestrated by our son Kurt, who manipulated [Lyle] into filing this action . . . against his will." She requested the court essentially stay the proceedings until Lyle has undergone "a formal neurological/psychological examination" to determine if Lyle's legal separation request [was] voluntary.

Joann provided the following evidence to support her claim. First, she asserted Lyle suffered from "cognitive impairment and short term memory loss." She stated that in July 2010, Andrew Oscar Schreiber, a neurologist, neurosurgeon, and friend of the family informally examined Lyle and believed his short term memory loss may be the result of "metabolic insults" or "hydrocephalus." Joann speculated Lyle's condition provided Kurt and the family's accountant for the past 20 years, Thomas G. Donovan, "the opportunity" to secure powers of attorney.

Joann said she was not aware that in November 2009, Donovan was granted power of attorney over Lyle's financial affairs and Kurt was granted power of attorney over health care decisions. These documents were prepared and supervised by attorney Donna R. Bashaw, a certified elder law attorney. Joann believed Kurt's motivation was to take control of the family's assets. She added that Kurt was upset with her because she would not let him purchase Lyle's dental practice. She explained Kurt, also a dentist, offered to pay $400,000 for the practice but because she did not think he would be able to secure financing, she and Lyle sold it for $520,000 to a third party.

4

Joann said it was highly suspicious this transaction occurred just six weeks before Kurt and Donovan secured their respective powers of attorney over Lyle's affairs.

Finally, Joann stated the motion for preference should not be granted because Lyle failed to provide the court with proof about his medical condition. She stated his knee surgery does not "rise[] to the level of a medical condition that would necessitate an advanced trial date." Joann submitted an e-mail written by Lyle's counsel to establish his condition was not as bad as Lyle claimed. Counsel wrote Lyle was "in excellent shape" on one day (August 26, 2010). Joann concluded her declaration by stating she did not want her marriage to end and she wanted to continue to visit and care for Lyle on a daily basis: "I want to continue our relationship for as long as we both shall live." She stated an advanced trial date would deprive her of her due process rights to discovery, would preclude a neurological examination of Lyle, and would make things difficult because the marital estate was valued "at several million dollars." She explained, "An estate of this size and complexity cannot be divided overnight without adequate accounting, depositions and other discovery."

Lyle filed a reply declaration pointing out Joann's declaration was full of contradictions, i.e., Lyle is so weak he is being controlled by his son, yet he is not sick enough to qualify for trial preference. Lyle declared his health continued to deteriorate, and he was recently re-hospitalized for another infection. Lyle stated he was fully aware when he signed the petition requesting legal separation. Lyle stated he still wanted a legal separation and to manage his own financial affairs apart from Joann. He denied being manipulated by Kurt and noted Kurt had tried to get him to change his mind and dismiss the legal separation. Lyle declared, "Although I have expressed to [Joann] that I want a separation, she simply refuses to accept my decision. Interesting that [she] says she loves me, yet she continually interferes with my healthcare decisions." He offered two examples. First, Joann refused to transfer him to a facility he preferred because it was closer to the family. Second, she tried to cancel his contract with an assisted living

5

nursing residence. He also clarified Schreiber was simply a family friend who visited and offered the services of other specialists, but Lyle declined the offer.

Lyle stated Joann rarely visited him in the hospital, but after filing his legal separation petition, she tried to see him more often "even though [he did] not want to see her. The first time [she] showed any genuine concern for [his] healthcare was <u>after</u> [he] filed the petition . . . . [His] relationship with [Joann] has been very contentious for the last 30 years, not just recently." Lyle explained Kurt did not cause him to file for legal separation, but he asked Kurt to help him and support his decision.

As for the sale of the dental practice, Lyle stated Joann did not consult him before moving forward with the sale and he had hoped to keep the practice in the family. He was upset by her actions, but it was not the reason he was seeking legal separation. He explained the durable powers of attorney were not prepared in response to the sale but because Joann was trying to move him out of a care facility against his will. Lyle believed Joann wanted him to move to a less expensive facility. He stated, "Selling the practice was just another red flag that [Joann] would continue to act against [his] wishes."

Joann filed a sur-reply. She reiterated Lyle's death is not imminent and therefore trial preference was not necessary. She denied not caring for Lyle's health or interfering with his healthcare decisions, and she described some of the care she had provided to him. She reasserted Lyle's actions and declarations were being controlled by Kurt. She provided a lot of details about the sale of the dental practice, believing it was the reason Lyle wanted the separation.

On September 17, 2010, Judge David L. Belz granted the motion for preference and ordered Joann to complete her preliminary declaration and disclosure. The trial court permitted Joann to proceed with a neuropsychological examination of Lyle. It set a mandatory settlement conference for mid-December and scheduled trial for January 11, 2011.

6

Thereafter, the parties stipulated to have the matter heard by retired Judge Thomas R. Murphy at JAMS. The parties submitted written trial briefs, and Judge Murphy arranged to have the hearing on June 24, 2011, at Lyle's assisted living facility, the JAMS offices in Orange, and Joann's counsel's law offices in Newport Beach.

Judge Murphy prepared a detailed statement of decision, which we will incorporate in large part by reference, because it highlights the factual basis for the court's ruling. The statement of decision began with a history of the case, as we have already described above. The only additional fact included was Lyle currently resided in an assisted living facility where caretakers help him 24 hours a day. Judge Murphy explained the parties stipulated Lyle's pleadings could be deemed to have been amended to request a dissolution of the marriage if the court found Lyle was mentally capable of requesting the dissolution. The judge framed the issue to be decided as follows: "Is Lyle . . . capable of making a reasoned decision of consequence; is his request to dissolve his marriage to Joann a reasoned decision?"

The court stated it had examined the testimony of several witnesses. In the statement of decision, the court began by recounting parts of Lyle's trial testimony as follows: "'He wanted to make his own decision.' [¶] 'He wanted to continue living in the [a]ssisted [l]iving [f]acility.' [¶] 'He did not want to go home and live with Joann.' [¶] 'He does not get along with Joann.' [¶] 'He does not particularly like it when Joann visits him at the facility.' [¶] 'He does not think his relationship with Joann could ever be restored.' [¶] 'He thought he would be angry at Joann for one reason or another no matter what we do.' [¶] 'He enjoys visits with his sons Kurt and Guy, and . . . Donovan, his CPA.' [¶] '''He does not enjoy visits with his son Nick because of the latter's comments that the "Father is wrong" and "under Catholicism you're married forever."''' [¶] 'He trusts . . . Donovan . . . his former CPA and his current agent/attorney-in-fact [regarding] financial matters.' [Exhibit 16.] [¶] Lyle was asked if he knew the difference between a guess and an estimate. His response was, 'An estimate has got fact;

7

a guess doesn't.'  [¶]  He was also asked the following questions and gave the following answers:

'Q.  Do you want to be divorced from Joann?

'A.  Yes.

'Q.  Do you understand that a divorce will end your marriage to Joann?

'A.  Yes.

'Q.  Do you and Joann have major differences between you that have broken down your marriage?

'A.  Yes.

'Q.  Is there any possibility that counseling would save your marriage?

'A.  No.

'Q.  Have you been a resident of California for the last several years?

'A.  Yes

'Q.  Have you been a [resident] of Orange County for the last several years?

'A.  Yes."

The court found relevant the following statements from Joann:  She believes, "'Lyle has been ill for some time[]'" and he "'blames her for not selling his dental practice to their son Kurt.'"  Joann admitted she had a bad relationship with Kurt and she opined "Kurt [was] exercising undue influence over Lyle.'"  In addition, she would like to bring Lyle home and care for him, and she did not want to dissolve her marriage.

Next, the court discussed the testimony of Nick and Guy.  Nick stated he visited Lyle weekly.  Nick had "'run-ins with his brother Kurt [regarding] his parents' marital proceedings.'"  Nick heard his father say he did not want to go through with the divorce and he witnessed "'Exhibit 12, wherein Lyle requested a meeting with Joann and Lyle's attorney.'"

8

Guy stated he visited his father daily and there was no animosity between him, Lyle, Joann, Kurt, or Nick. He prepared Exhibit 12 for Lyle's signature, but he "'generally stays away from the topic of divorce with Lyle.'"

In its statement of decision, the court noted the following facts from Donovan's testimony: (1) he has been the family's CPA for over 20 years, and Kurt is also his client; (2) he perceived Kurt was disappointed when Lyle's dental practice was sold to a third party; and (3) he is currently compensated for the services rendered on behalf of Lyle.

The court found relevant the following testimony from Bashaw, the attorney who prepared the Advance Health Care Directive and Uniform Statutory Form Power of Attorney for Lyle. The judge noted Bashaw assessed Lyle's condition when preparing the documents. She was asked if she usually had a "'neurologist or neuropsychologist do an evaluation if any suspicions [are] raised" when providing or witnessing durable powers of attorney. She responded, "'If I really thought the person was on the border of having capacity to do documents, Yes, I would.'" She added, "'I know [Lyle] was physically ill. I was never told there was any mental illness and I didn't see or discern any mental incapacity.'"

Next, the trial court turned to the four health care professionals, who rendered different conclusions about Lyle's mental status. Lyle's personal physician, Valerie Valentine Acevedo, D.O., specializing in neurology and electromyography, diagnosed Lyle as having mild cognitive dementia, depression, and hydrocephalus. Her report was submitted to the court (Exhibit 7).

Nathan E. Lavid, M.D., a clinical and forensic psychologist, and Gary Freedman-Harvey, Ph.D., a licensed psychologist jointly reported Lyle met the diagnostic criteria for dementia, alcoholism, and "'provisionally for [d]epression . . . he is mentally compromised to be susceptible to the influence of others . . . he is currently [incapable] of

9

exercising the judgment and expressing the wish that his marriage of 49 years be dissolved.' (Exhibit 4)."

Robert Joseph Sbordone, Ph.D., a consultant in clinical neuropsychology, reported Lyle "'understands his health care needs and is capable of deciding on the [s]killed [n]ursing [c]are facility he wishes to be treated so that his medical problems and health care needs are properly addressed.' (Exhibit 9)"

The court concluded, "All of the health care professionals testified, and . . . Lavid, Freedman-Harvey and Sbordone agreed that should Lyle be suffering with dementia, the appropriate designation thereof was [s]ubcortical [d]ementia. The same three professionals were asked by the [c]ourt to meet and confer . . . and thereafter set forth their template of the symptoms associated with mild, moderate and severe [s]ubcortical [d]ementia. Exhibit 13 is [the] result of their efforts." The court noted all the health care professionals commented on Exhibit 13 as follows: Acevedo opined Lyle suffered from mild dementia, and her testing showed Lyle's thought processes were impaired. Sbordone agreed Lyle suffered mild impairment in the areas of memory speed of cognitive process, abstract thinking, and moderate impairment in neuroimaging resulting from a mild atrophy. However, "With these exceptions . . . Sbordone opined that Lyle had no other symptoms of [s]ubcortical [d]ementia."

The court summarized Freedman-Harvey's findings. Freedman-Harvey opined Lyle suffered from mild impairment in the area of memory. He stated Lyle was "on the cusp between moderate and severe in the area of [s]peed of [c]ognitive [p]rocess" and there was moderate impairment in the areas of neuroimaging and insight. Freedman-Harvey concluded there was severe impairment in the areas of executive functions. The court noted Freedman-Harvey stated, "he had not concluded that Lyle had severe dementia," only that the subcortical dementia interfered with Lyle's thought processes. And finally, the court noted Lavid opined Lyle suffered severe impairment in all categories.

10

In its statement of decision, the court relied on the above factual findings to reach the following conclusion: "There was no evidence to suggest Lyle was not qualified to act as a witness. He was capable of expressing himself [regarding] the matter at issue (the dissolution of his marriage), and [he] appeared to understand his obligations to tell the truth. Lyle met the qualifications of being a witness (Evidence Code [section] 700). The question before the [c]ourt was whether Lyle was capable of making the reasoned decision to dissolve his marriage. [¶] The following is clear. [¶] Lyle testified in the presence of his wife, his wife's lawyer, his two lawyers, . . . Freedman-Harvey, the court reporter, and the undersigned. He was examined and cross-examined for approximately 30 minutes. He was able to respond appropriately to the questions he was asked; he was able to read documents; he said he signed Exhibit 2 because his son Guy asked him to sign it; he expressed humor and sarcasm. He reaffirmed his decision to name Kurt as his health care director and [Donovan] as his attorney in fact for financial issues. At one point during cross-examination he was asked if he were becoming angry and he said yes. Lyle was wearing hearing aids and did not appear to be ambulatory."

In addition, the court concluded, "Dementia is apparently the loss of cognitive ability beyond what might be expected from normal aging. It is a progressive disease . . . i.e., being described as mild, moderate and severe. The experts all agree that Lyle . . . has dementia. The question is, however, not whether Lyle has dementia, but whether his impairment is such that he no longer has the capability of making a reasoned decision to end his marriage. [¶] Lyle chose to give . . . Donovan his power of attorney for financial issues and chose to give Kurt . . . his [a]dvanced [h]ealth [c]are [d]irective . . . neither of these acts would suggest mental impairment, but insight and the ability to engage in abstract thinking. Lyle's comparison of the terms 'guess' and 'estimate' certainly suggest an ability to track a topic and [should] be given equal weight with inability to give the right answer on the MOCA (i.e., his saying that the similarity

11

between a train and a bicycle was 'wheel' when the correct answer was transportation). [¶] There was no indication that Lyle could not handle activities of daily living, obviously subject to his current physical health. [¶] After reviewing the testimony and evidence, including re-reading the health care professional reports, re-reading the trial briefs and my notes, I have concluded that Lyle . . . is capable of making a reasoned decision of consequence, i.e., he is capable of making the reasoned decision to end his marriage with Joann . . . . [¶] Accordingly, and pursuant to the stipulation of counsel at the beginning of the trial, Lyle . . . is hereby granted a dissolution of his marriage to Joann . . . ."

## II

*A. Evidence Lyle had "Capacity to Understand"*

Joann argues the court failed to require evidence Lyle had the capacity to understand the meaning of concepts critical to his decision to divorce her. The parties submit there are not cases directly on point as to the correct legal standard for capacity to dissolve a marriage. They also appear to agree, simply being "competent" to testify as a witness under Evidence Code section 700 is not the test. Instead, they offer different analogies to authority relating to the mental capacity required for other types of important decisions (such as the capacity to marry and testamentary capacity).

Specifically, Lyle contends an appropriate analogy would be the standard used to determine testamentary incompetency. "It has been held over and over in this state that old age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness and mental confusion do not furnish grounds for holding that a testator lacked testamentary capacity." (*Estate of Selb* (1948) 84 Cal.App.2d 46 49 (*Estate of Selb*); Prob. Code, § 6100.5.) Joann disagrees with this analogy and suggests two approaches she believes require a higher level of mental capacity. First, she claims Lyle had the burden of proving he was capable of "exercising a judgment and expressing a wish, that the

12

marriage be dissolved on account of irreconcilable differences and has done so." (*In re Marriage of Higgason* (1973) 10 Cal.3d 476, 483 (*Higgason*) [guardian can seek dissolution on behalf of conservatee who expressed wish to divorce];[2] see also *In re Marriage of Straczynski* (2010) 189 Cal.App.4th 531, 540 (*Straczynski*) [conservatee must "continue[]" to maintain the necessary capacity throughout the dissolution proceeding].) Second, in her reply brief, Joann introduces a statutory test for mental capacity (not discussed at trial) relating to the decision to marry, and she argues this standard should have been applied by the trial court in this case. (Citing Prob. Code, §§ 811, 812.)

As we will explain in more detail below, the determination of a person's mental capacity is fact specific, and the level of required mental capacity changes depending on the issue at hand. Complicating matters are the multiple, and overlapping, statutes regarding the "capacity" of elders (anyone over the age of 65)[3] found in the Probate Code, the Welfare and Institutions Code, the Civil Code, and the Family Code. After reviewing the relevant case law, we conclude mental capacity can be measured on a sliding scale, with marital capacity requiring the least amount of capacity, followed by testamentary capacity, and on the high end of the scale is the mental capacity required to enter contracts. The burden of proof on mental capacity changes depending on the issue; there is a presumption in favor of the person seeking to marry or devise a will, but not so in the context of a person executing a contract.

The basic starting point for any mental capacity determination is Due Process in Competence Determinations Act found in Probate Code sections 810 to 813, 1801, 1881, 3201, and 3204 (the Act). In 1995, the Legislature created the Act to clarify

---

[2]    *Higgason, supra,* 10 Cal.3d 476, was overruled on other grounds in *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 352.

[3]    Welfare and Institutions Code section 15610.27 provides, "'Elder' means any person residing in this state, 65 years of age or older."

13

the legal capacity of a person who has a mental or physical disorder. The Act expressly states it broadly covers the capacity of such persons to perform all types of actions, "including, but not limited to" contracting, conveying, executing wills and trusts, marrying, and making medical decisions. (Prob. Code, § 810, subd. (b).) "The mere diagnosis of a mental or physical disorder shall not be sufficient in and of itself to support a determination that a person is of unsound mind or lacks the capacity to do a certain act." (Prob. Code, § 811.) Moreover, the Act declares there "exists a rebuttable presumption affecting the burden of proof that *all persons have the capacity* to make decisions and to be responsible for their acts or decisions." (Prob. Code, § 810, subd. (a), italics added.)

The Act offers a wide range of potential mental deficits that may support a "determination that a person is of unsound mind or lacks the capacity to make a decision or do a certain act[.]" (Prob. Code, § 811, subd. (a) [lists 18 mental functions].) The categories of mental functions generally relate to one's ability to understand and recall one's surroundings, and include (but are not limited to) alertness and attention, orientation to time, ability to concentrate, short and long term memory, ability to communicate, recognition of familiar objects and persons, ability to plan and reason logically, delusions, ability to modulate mood, and affect. (*Ibid.*) The Legislature noted a deficit in one of the mental functions listed "may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions *with regard to the type of act or decision in question*." (Prob. Code, § 811, subd. (b), italics added.) In other words, under this statutory scheme, incompetency due to an "unsound mind" cannot be based on the diagnosis of a medical or physical disorder, and it is not enough to identify a few mental deficits. There must be a causal link between the impaired mental function and the issue or action in question. Moreover, in

14

considering the causal link, courts should also consider "the frequency, severity, and duration of periods of impairment." (Prob. Code, § 811, subd. (c).)

Whereas Probate Code section 811 defines "unsound mind" deficit criteria, Probate Code section 812 provides additional criteria to be considered when deciding whether a person lacks "capacity to make decisions." It states: "Except where otherwise provided by law, including, but not limited to, [the Probate Code section regarding informed medical consent] and the statutory and decisional law of testamentary capacity, a person lacks the capacity to make a decision unless the person has the ability to communicate verbally, or by any other means, the decision, and to understand and appreciate, to the extent relevant, all of the following: [¶] (a) The rights, duties, and responsibilities created by, or affected by the decision. [¶] (b) The probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision. [¶] (c) The significant risks, benefits, and reasonable alternatives involved in the decision."

Simply stated, the required level of understanding depends entirely on the complexity of the decision being made. There is a large body of case authority reflecting an extremely low level of mental capacity needed before making the decision to marry or execute a will. Marriage arises out of a civil contract, but courts recognize this is a special kind of contract that does not require the same level of mental capacity of the parties as other kinds of contracts. Family Code section 300, subdivision (a) simply states marriage requires "the consent of the parties capable of making that contract." (See also *Rathburn v. Rathburn* (1956) 138 Cal.App.2d 568, 573-574.) Generally, "All persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights." (Civ. Code, § 1556.) However, as described in Probate Code section 811, an "unsound mind" requires more than the diagnosis of a physical or mental disorder. Moreover, a person under a conservatorship, who is generally without contractual power, may be deemed to have marital capacity. (Prob. Code, § 1900

15

[appointment of conservator does not "affect the capacity of the conservatee to marry"].)

Likely in recognition of the fundamental right to marry (*Ortiz v. Los Angeles Police Relief Assn.* (2002) 98 Cal.App.4th 1288, 1304), the Legislature enacted a statute permitting a court to determine a conservatee's capacity to marry based on petition of the conservator, the conservatee or "any relative or friend of the conservatee, or any interested person." (Prob. Code, § 1901, subd. (b).) "Whether the conservatee has capacity to marry is determined by the law that would be applicable had no conservatorship been established."[4] (Cal. Law Revision Com. com. 52A West's Ann. Prob. Code (2013 ed.) foll. § 1900, p. 280.) Thus, the court may rely on subjective information provided by "any interested party" on the conservatee's capacity to marry and must ignore a prior adjudication deeming it necessary to appoint a conservator because the conservatee lacked the legal capacity to enter into all transactions that bind or obligate the conservatorship estate. (Prob. Code, § 1872.) And, as mentioned earlier, there is also a presumption in support of finding the required mental capacity to marry. (Prob. Code, § 810.)

Similarly, the standard for testamentary capacity is exceptionally low. Probate Code section 6100.5, lists criteria stating an individual is not mentally competent to make a will if unable to understand the nature of the testamentary act, understand and recollect the nature of his or her assets, or remember and understand his or her relationship to family members, friends, and those whose interests are affected by the will. (Prob. Code, § 6100.5, subd. (a)(1).) In addition, an individual lacks mental competence if he or she suffers from a mental disorder with symptoms such as delusions

---

[4] Probate Code section 1801 provides: "(a) A conservator of the person may be appointed for a person who is unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter . . . . [¶] (b) A conservator of the estate may be appointed for a person who is substantially unable to manage his or her own financial resources or resist fraud or undue influence . . . . Substantial inability may not be proved solely by isolated incidents of negligence or improvidence."

16

or hallucinations that cause him or her to devise property in a way the individual "would not have done." (Prob. Code, § 6100.5, subd. (a)(2).) Interestingly, this seemingly clearly written statutory authority has been interpreted by the courts to create a very low standard for testamentary capacity. As noted by Lyle's counsel, it is well settled, "old age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness and mental confusion do not furnish grounds for holding that a testator lacked testamentary capacity." (*Estate of Selb, supra,* 84 Cal.App.2d at p. 49.) Indeed, even hallucinations and delusions do not demonstrate lack of capacity if they are not related to the testamentary act. (*Estate of Perkins* (1925) 195 Cal. 699, 704; see also *Estate of Fritschi* (1963) 60 Cal.2d 367, 372 [testator in hospital with fatal cancer, physically weak, disturbed and under heavy dosage of drugs possessed testamentary capacity].) And like marital capacity, the mere fact the testator is under a conservatorship will not support a finding of lack of testamentary capacity without additional evidence of mental incompetence for making a will. (Prob. Code, § 1871, subd. (c).)

Turning to the capacity to contract (which includes the capacity to convey, create a trust, make gifts, and grant powers of attorney) the baseline is contained in Probate Code sections 811 and 812. But Civil Code Section 39, subdivision (b), provides more specific guidelines for determining the capacity to contract. "A rebuttable presumption affecting the burden of proof that a person is of unsound mind shall exist for the purposes of this section if the person is substantially unable to *manage his or her own financial resources or resist fraud or undue influence*." (Italics added.) This is the same showing required for establishment of a conservatorship. (Prob. Code, § 1801, subd. (b) [conservatorship established when person is unable to manage financial resources or resist fraud or undue influence].) If the Civil Code section 39, subdivision (b) presumption arises, the burden is placed on the party claiming capacity to contract to prove that while he or she may be unable to manage his or her financial resources or

17

resist fraud or undue influence, he or she is nevertheless still capable of contracting being of sound mind as defined by Probate Code section 811.[5]

It is unclear why testamentary capacity and marital capacity have lower standards than for mental capacity, and a different burden of proof, from what is required before an elderly person diagnosed with mild dementia executes a contract. With respect to marital capacity, we are aware of the many well established statutory safeguards in place to protect spouses and their assets, and therefore, it is understandable why the fundamental right to marry would warrant lowering the mental capacity threshold. As for testamentary capacity, there is also a large body of statutory and case law designed to protect testators and their heirs. And common sense tells us a living person will not be harmed by his or her own testamentary documents. The same cannot be said for the parties to a contract, including the innocent third parties who may have financially relied on the terms of a contract, the elderly person who has made an inappropriate conveyance, or the person who prepared an imprudent grant of a power of attorney. These types of contractual decisions create rights, duties, and responsibilities that require a higher level of understanding and appreciation, and the parties are not afforded the same safety net of laws that protect parties to marriage contracts or testamentary acts.

In light of the above authority, we conclude the mental capacity required to end one's marriage should be similar to the mental capacity required to begin the marriage. As discussed above, the threshold is low. A person under a conservatorship, who is generally without contractual power, may be deemed to have marital capacity. (Prob. Code, § 1900.) And our Supreme Court, in *Higgason, supra,* 10 Cal.3d 476, held a conservatee could also initiate a dissolution proceeding as long as he or she has the

---

[5] Civil Code section 2296 [appointment of agents] and Probate Code section 4120 [appointment of an attorney in fact] contain identical language to state simply that any person with the capacity to contract may appoint an agent or attorney in fact.

capacity to express that he or she wants to end the marriage. In that case, a 73-year-old woman (Wife) with "substantial assets" married a 48-year-old man (Husband) who had "little or no means." (*Id.* at p. 479.) Approximately two weeks later, Wife, based on her own petition, was adjudicated an incompetent person and the court appointed a conservator.

Thereafter, Wife filed two separate actions to terminate her marriage, but dismissed them. (*Higgason, supra,* 10 Cal.3d at p. 479.) She filed her third petition soon after Husband was forcibly removed from the family home. Wife had evidence he was "'up on booze and pills'" and she was frightened by his activities. (*Id.* at p. 480.) Wife "herself signed and verified the petition as well as two declarations in support of an order to show cause for injunctive relief against . . . [H]usband visiting her premises." (*Ibid.*) One issue before the trial court was whether, in light of the conservatorship, Wife's temporarily appointed guardian ad litem (Wife's daughter) could initiate the proceedings. Wife's conservator of the estate, her bank, had declined to act as guardian ad litem in the marital proceeding. (*Ibid.*)

The court held a hearing on the restraining order and considered testimony Wife was ill and confined to bed. (*Higgason, supra,* 10 Cal.3d at p. 480.) The court also heard evidence Wife asked her daughter to come to her home because she was afraid of Husband and his presence would have a "serious emotional effect" on her. The court granted the preliminary injunction, noting Wife was not insane and "'not without ability to think.'" (*Id.* at p. 481.)

Before the hearing on the petition for dissolution, Wife's counsel took her deposition and she testified "to the facts of the marriage and to irreconcilable differences and stated that as far as she was concerned the marriage was over." (*Higgason, supra,* 10 Cal.3d at p. 481.) Because Wife was physically unable to appear in court, the parties stipulated the deposition would be introduced into evidence. The *Higgason* opinion includes the entire transcript of the deposition within a footnote. Wife did not describe

19

the nature of the irreconcilable differences. Wife simply stated she wanted the marriage to be over. The only reason she offered for her decision was that she gave Husband several chances to change (reflected by the two dismissed petitions for dissolution), but "he thought I was taking dope, and that is more than I ever would take from anybody." (*Id.* at p. 482, fn. 3.)

The Supreme Court in *Higgason* rejected Husband's argument the petition for dissolution of marriage could not be brought by a guardian ad litem, on behalf of a spouse who is under conservatorship. (*Higgason, supra,* 10 Cal.3d at p. 483.) The court reasoned such a proceeding may be brought "provided it is established that the spouse is capable of exercising a judgment, and expressing a wish, that the marriage be dissolved on account of irreconcilable differences and has done so. [¶] [T]his requirement has been met. . . . [T]he trial court found that the wife was not insane and had the ability to think; the record shows that the wife signed and verified the petition for dissolution of marriage and also two declarations in support of . . . injunctive relief against the husband's visiting her premises; and her deposition shows that she desired a dissolution of the marriage." (*Id.* at pp. 483-484.) The Supreme Court reasoned appointment of a conservator "does not constitute a determination that the conservatee is in any way 'insane or incompetent' [citations] . . . ." (*Id.* at p. 484.) It cited to legal authority, enacted before the Family Law Act, holding a guardian ad litem could not obtain a divorce for an incompetent wife contrary to her express wishes. (*Ibid*, citing *Cohen v. Cohen* (1946) 73 Cal.App.2d 330 (*Cohen*).) "It was there implied, however, that if the wife's capacity of consenting to a divorce were established, and if she verified the divorce pleadings and testified that she wanted a divorce, a divorce [by] her guardian ad litem's complaint might be proper." (*Higgason, supra,* 10 Cal.3d at p. 485.)

In *Straczynski, supra,* 189 Cal.App.4th 531, the appellate court extended *Higgason* by holding an incapacitated individual may *maintain* a dissolution proceeding only if he or she remains capable of "'exercising a judgment, and expressing a wish, that

20

the marriage be dissolved'" throughout the proceedings. (*Id.* at p. 541.) The court reasoned this interpretation was consistent with *Higgason* and *Cohen* because those courts recognized the decision to dissolve a marriage is intensely personal. Just as a guardian cannot maintain an action so "'strictly personal'" against the conservatee's wishes, the act of filing and maintaining a divorce action "have the same intensely personal quality" and the conservatee must be capable of making the decision to file the petition and expressing his or her desire to end the marriage. (*Id.* at p. 541.)

In the case before us, Joann challenges the court's finding Lyle was mentally competent to maintain an action for marital dissolution, arguing the ruling is not supported by substantial evidence. Specifically, Joann asserts the trial court's "ultimate conclusion" that Lyle was capable of making a "'reasoned decision of consequence'" does not meet the *Higgason* standard. She maintains the court improperly focused on two factors: (1) Lyle's decision to give Donovan and Kurt power of attorney over financial and health care decisions; and (2) Lyle's ability to distinguish between the words "'guess'" and "'estimate.'" She explains the first factor is stale information because the assignment occurred in November 2009 and does not prove Lyle was still mentally capable months later when he petitioned for separation/divorce. In addition, Joann points out that there is no expert testimony to support the court's conclusion Lyle's ability to distinguish between words means he has the ability to make a reasoned decision. And finally, she argues the expert testimony presented at trial did not establish the capacity required to seek marital dissolution and the burden was on Lyle to prove he exercised a judgment about ending his marriage. She concludes there was no evidence Lyle could do "anything beyond 'expressing a desire' to end the marriage in response to leading questions from his counsel.'"

We have carefully reviewed the record and the court's statement of decision, and reach a different conclusion. Given the lower mental capacity threshold required for decisions to enter or end a marriage, we disagree with Joann's argument the

21

trial court failed to require the "right" kind of evidence to make its ruling and improperly failed to place the burden of proving a "sound mind" on Lyle.

As mandated by Probate Code section 810, Lyle's diagnosis of dementia is not sufficient in and of itself to support a determination he was of unsound mind or lacked the mental capacity to end his marriage. The trial court correctly started with the baseline presumption Lyle had the capacity to make a reasoned decision to end his marriage, and cited to several facts in the record that supported the presumption.

For example, we find the trial court appropriately relied on the fact Lyle was capable of assigning durable powers of attorney for financial decisions and healthcare. Although the execution of these documents occurred several months prior to his decision to file a petition for separation, the trial court recognized the mental capacity required for those contractual decisions was high. In the statement of decision, the trial court stated it relied on a certified elder law attorney's testimony she did not "see or discern any mental incapacity" when she supervised preparation and execution of the durable power of attorney documents in November 2009. She testified she would have required a neurologist of neuropsychologist do an evaluation if she suspected her client "'was on the border of having capacity to do documents.'"

Thus, as of November 2009, Lyle was mentally capable of making the reasoned choice to turn over his finances and health care decisions to his trusted friend and his son. Lyle reasonably explained in his declaration that he made these assignments after Joann tried to move him out of a care facility against his will. The court concluded Lyle's decision did not suggest mental impairment but rather supported the conclusion Lyle's mild dementia had not affected his "insight" or "ability to engage in abstract thinking." We agree deciding to assign durable powers of attorney required the cognitive capacity to contemplate his future of declining physical health, to evaluate Joann's intentions and conduct, and the need to seek a legal remedy to protect his financial and emotional best interests. In short, the assignment supported the conclusion Lyle was of

22

sound mind because he possessed the "ability to reason" and "ability to plan, organize, and carry out actions in [his] own rational self-interest." (Prob. Code, § 811, subd. (a)(2)(E) and (F) [examples of mental functioning related to information processing].)

Just six months later, Lyle himself signed the petition seeking separation from Joann, two declarations, and a motion for trial preference. Like the conservatee in *Higgason*, Lyle stated several times he wanted his marriage to be over. The reasons for seeking legal separation were consistent with his earlier decision to remove his assets and medical decisions from Joann's reach. There was no evidence suggesting there would be an appreciable difference in Lyle's mental status in a six-month period. Indeed, Joann opposed the motion for trial preference asserting there was no reason to speed up the proceedings. For all the reasons stated above, we conclude the information regarding Lyle's mental capacity six months prior to seeking marital dissolution was not too stale and was properly relied upon by the trial court in considering Lyle's level of mental capacity.

Likewise, we conclude the trial court properly focused on the nature of Lyle's testimony during the trial. The court observed Lyle's demeanor and mental acuity first hand, and it appropriately included in the statement of decision its assessment of Lyle's mental capacity. The court focused on many of the mental functions listed in Probate Code section 811: It noted Lyle was capable of testifying in front of Joann, several lawyers and a court reporter for approximately 30 minutes. The court found it relevant that Lyle responded appropriately to questions, he recognized his signature, he expressed humor and sarcasm, and he was angered by questions on cross-examination. These observations related to mental functions such as (1) "alertness and attention[,]" (2) "level of . . . consciousness[,]" (3) "orientation to time, place, person and situation[,]" and (4) the ability to "concentrate" and process information appropriately. (Prob. Code, § 811, subds. (a)(1)(A)-(C), (a)(2)(A-C).) The court also properly relied on the fact Lyle

23

reaffirmed at trial his earlier decision to assign durable powers of attorney, which relates to the mental functions of short and long term memory and the recognition of familiar objects and persons. (Prob. Code, § 811, subd. (a)(2)(A) & (C).)

We do not understand Joann's criticism of the trial court's consideration of Lyle's testimony regarding his knowledge of the differences between a guess and an estimate. She asserts none of the experts established a relationship between knowing these definitions and Lyle's ability to make a reasoned decision. We find it helpful to view the statement in context. It was made during cross-examination after Lyle was asked when he initially decided to file for legal separation. Lyle responded he guessed it was six months ago. Joann's attorney asked if he knew the difference between a guess and an estimate. Lyle responded, "Yes." When counsel asked Lyle if he wanted an explanation of the difference, Lyle reiterated, "I know the difference." Counsel then asked Lyle to explain the difference, and he replied, "An estimate has got fact involved; a guess doesn't."

In its statement of decision, the court used Lyle's response as an example of Lyle's ability to "track a topic," which is a skill related to many of the mental functions listed in Probate Code section 811 [alertness, information processing, and thought processes].) The skill also related to a mental deficit related to thought processes discussed in the Probate Code section 811, subdivision (a)(3)(A) [does person have severely disorganized thinking].) Lyle's sequence of reasoned responses, regarding one topic, clearly suggests his thinking is organized and logical. More importantly, the court's discussion of Lyle's responses also related to the court's determination the question about estimates should "be given equal weight" with his inability to correctly answer some of the test questions provided by the experts. The court gave an example of one such test question: When Lyle was asked about the similarities between trains and bicycles he replied "wheels" (which was technically correct) but the right answer for the test was "transportation." The court was simply pointing out what the experts had

24

already reported. Knowing the differences and similarities between words has a relationship to whether a person has the mental capacity required to make a reasoned decision.

Joann's final argument relates to the alleged lack of expert testimony to establish the mental capacity required by the law to end a marriage. As stated above, Joann's argument is incorrectly premised on the theory the mental capacity required is high. After reviewing the record, we conclude Lyle's testimony and his experts' testimony provided ample evidence Lyle was mentally capable of "exercising a judgment, and expressing a wish, that the marriage be dissolved on account of irreconcilable differences and has done so." (*Higgason, supra,* 10 Cal.3d at p. 483.)

For example, Lyle both verbally and in writing expressed his judgment and wishes to be divorced. At trial, Lyle confirmed he did not want Joann to make financial or healthcare decisions for him. When asked if counseling could save his marriage, he replied, "No." Lyle explained he had differences with his wife about making decisions, such as their disagreement about him living in the assisted living facility. He unequivocally stated he did not want to move home and he wanted a divorce because "We just don't get along." On cross-examination, Lyle gave similar answers, stating he understood Joann did not want to end the marriage, and even if she forgave him for filing for divorce "[o]ur relationship could [not] ever be restored." We dare say there are not too many other ways to express one's wish to end a marriage.

Lyle's experts included his treating physician (a neurologist). Acevedo performed cognitive and dementia screening on Lyle and prepared a report admitted into evidence. Acevedo diagnosed Lyle as having mild cognitive dementia. Based on the testing results, she opined Lyle was able to make some judgments but not others. Acevedo stated she met with Lyle a couple of days before testifying and he was "doing better. He is able to answer questions, engage in conversation, he's able to state with certainty what he wants and what he doesn't want. And he did score with good judgment

25

on the test within normal range." She explained people with severe dementia are often mute, completely dependent on the care of other people, and unable to eat or bathe. Acevedo believed Lyle used "good sound judgment for his medical care thus far[]" and it was her impression he was not susceptible to undue influence. Acevedo concluded Lyle was mentally capable of making a reasoned decision about ending his marriage because they talked about it and based on the test results.

Lyle's second witness, a clinical neuropsychologist, agreed with the above expert assessment. Sbordone's expertise was in cognitive and neurobehavioral function. He had expertise in evaluating patients with dementia, had published three textbooks on the topic, and was involved in clinical trials of medication used to treat dementia. Sbordone stated he was asked to assess whether Lyle had any significant cognitive deficits or impairments that would affect his ability to render a decision about ending his marriage. He interviewed Lyle, reviewed his medical records, and performed several tests on Lyle. He and Lyle discussed his marriage and his reasons for wanting to separate. Sbordone testified that during the interview, Lyle also correctly recounted current events, recalled background information about himself and his family, and accurately described his health problems. Sbordone opined that based on his observations and test results, Lyle may suffer from mild dementia but he was not currently cognitively impaired such that he could not make a reasoned decision about wanting a divorce. He also offered reasons why Joann's experts' opinions to the contrary were incorrect.

Joann devotes a large portion of her opening brief discussing evidence she claims supports the conclusion Lyle's dementia was so severe he could not exercise a judgment or express a wish his marriage be dissolved, and her theory Lyle filed the petition because of undue influence. But we do not reweigh the evidence. The court had before it substantial evidence of Lyle's mental capacity both in the form of expert opinion and by its first hand observations. And given that courts must presume a person has the

26

capacity to make a decision about ending his or her marriage, and must apply the relevant legal authority requiring a lower level of mental capacity, we find no basis to disturb the trial court's judgment. There was much less information about the conservatee's mental capacity presented in the *Higgason* case, where the court simply relied on the fact Wife personally signed the petition and testified in her deposition she no longer wanted to be married.

B. *The Court did not Misstate the Facts of the Case*

Joann asserts that when a trial court misstates the evidence, its decision is an abuse of discretion. She argues the facts on which the decision was based "were not what the record actually shows." We disagree.

Joann finds fault with the trial court's summary of Freedman-Harvey's expert testimony. The court summarized Freedman-Harvey's conclusions as follows: The expert concluded Lyle suffered mild impairment in the area of memory, he was between moderate and severe in the area of speed cognitive process, severe in the area of executive functions and had moderate impairment in the area of neuroimaging and insight. The court also noted Freedman-Harvey *did not conclude Lyle had severe dementia,* but that he had subcortical dementia that interfered with his *thought process*. Joann's argument focuses only on this last statement.

Joann asserts the trial court did not understand the expert's testimony because Freedman-Harvey opined Lyle *had severe dementia*. Moreover, Joann argues the expert stated subcortical dementia interfered with Lyle's ability to make decisions, not Lyle's "thought process." This is the basis for her claim the trial court misstated the evidence. In an attempt to retry the case, Joann also sets forth reasons she believes the evidence presented by her experts was better than Lyle's experts and, therefore, should have been relied upon by the trial court. Based on these two "errors" she concludes the judgment must be reversed.

27

We have reviewed the record, and we have no doubt the trial court understood Freedman-Harvey's medical opinion. In its statement of decision, the court stated Freedman-Harvey reported Lyle was "'mentally compromised'" and unable to "'exercise[] the judgment and express[] the wish that his marriage of 49 years be dissolved.'"

The trial court's statement Lyle did not have severe dementia is contained in the portion of the statement of decision where the trial court summarized its discussion with the four experts. Because the four experts came from different backgrounds and areas of expertise, the court asked if they would confer and determine if they could reach any sort of consensus concerning Lyle's mental status. After discussing the medical definition of dementia, the experts agreed Lyle did not suffer from Alzheimer's dementia, but it was a kind of subcortial dementia. Freedman-Harvey testified the *subcortical dementia* was in the "moderate to severe" range. However, when specifically asked, "Has your testimony throughout this trial been that he has severe dementia?" Freedman-Harvey replied, "I don't believe that was my verbiage. I heard the word severe. I am less focused on the level of dementia than that there is *subcortical dementia that interferes with his thought processes*." (Italics added.) The court's summary accurately reflects this portion of the expert's testimony.

In any event, the level of dementia was not the factual issue being decided by the trial court. This was not a conservatorship proceeding. The sole issue before the trial court was whether Lyle had the required level of mental capacity, despite his diagnosis of subcortical dementia, to end his marriage. The statement of decision reflects the court clearly understood from the expert testimony that dementia involves varying degrees of loss of cognitive ability, but it also correctly recognized it must determine "not whether Lyle has dementia, but whether his impairment is such that he no longer has the capability of making a reasoned decision to end his marriage." We find no error.

28

*C. Evidence of Irreconcilable Differences*

This is the first argument raised in Joann's brief, and she devotes six pages to support her contention there was insufficient evidence in the record of "irreconcilable differences resulting in an irremediable breakdown of the marriage." Joann argues Lyle's mere "incantation of the words" he wanted a divorce is insufficient evidence to support the judgment. She says it is not enough for Lyle to say there are "'major differences'" that have broken down the marriage, and he must identify one major difference or explain how their disagreements broke down the marriage. She adds the two reasons Lyle gave for wanting to end his marriage were not good enough; suggesting disputes about where one chooses to live and health care decisions are a normal part of being married and can be simply resolved by assigning durable powers of attorney to third parties. In addition, she notes there is no evidence Lyle made any permanent decisions inconsistent with marriage, such as having an affair or pursing a different lifestyle. And Joann believes Lyle has not taken any actions demonstrating irreconcilable differences because he still lets Joann visit him and it is possible he moved out of their house and into an assisted living facility for reasons other than the breakdown of their marriage. Joann raises other examples of evidence purportedly missing, but we conclude the entire argument merits little discussion because Joann fails to cite a single case holding dissolution requires an adversarial litigation of objective, rather than subjective evidence, supporting irreconcilable differences.

It is well settled the decision that a marriage is irretrievably broken does not need to be based on objective facts. (*In re Marriage of Walton* (1972) 28 Cal.App.3d 108, 116 (*Walton*).) "[I]t is obvious that the court must depend to a considerable extent upon the subjective state of mind of the parties. Indeed, it was the legislative intent that that be a major consideration. [Citation.]" (*Id.* at p. 117.) The California Legislature, in

adopting no-fault divorce in 1969, recognized the divorce proceedings were already highly adversarial in nature and it was not helpful to issues of child custody and division of property to force one party to prove why they made the personal and necessarily subjective decision to end the marriage.

For this reason, the code "offers no precise definition or guidelines to measure the existence of 'irreconcilable differences.' Instead, it simply requires the court to determine there are 'substantial reasons for not continuing the marriage and which make it appear the marriage should be dissolved.' [Fam. Code, § 2311]" (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2012) § 2:33, p. 2-13.) "The irreconcilable differences ground is purposely broad. It is intended to represent the actual reasons underlying marital breakdowns and at the same time make irrelevant questions of "fault" or misconduct by either party. [Citations.]" (*Id.* at § 2:34, p. 2-13; see *Straczynski, supra,* 189 Cal.App.4th at p. 539 [court cannot deny dissolution on grounds it was not in petitioner's "best interest for financial and personal reasons"]; *Diosdado v. Diosdado* (2002) 97 Cal.App.4th 470, 474 (*Diosdado*) [fault not relevant in dissolution proceedings]; *Walton, supra,* 28 Cal.App.3d at p. 119 [grounds for dissolution changed "from a fault basis to a marriage breakdown basis"].) "The family law court may not look to fault in dissolving the marriage, dividing property, or ordering support." (*Diosdado, supra*, 97 Cal.App.4th at p. 474.) It is sufficient evidence for a party to subjectively decide the marriage is over and there is no hope of reconciliation.

The determination of irreconcilable differences is "not a ministerial one" (*Walton, supra*, 28 Cal.App.3d at p. 117), and trial courts should not make such findings perfunctorily. (*In re Marriage of McKim* (1972) 6 Cal.3d 673, 679.) Determination of this issue necessarily poses a question of fact, and we must uphold the trial court's factual determinations if they are supported by substantial evidence. (*In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152, 1157, 1161.)

30

The court's finding of irreconcilable differences in this case is amply supported by substantial evidence. Lyle alleged in his sworn petition the existence of irreconcilable differences. He repeatedly stated in his declarations seeking trial preference he wanted to actively participate in his legal separation case to stop Joann from further interfering with his medical care. He explained his relationship with Joann has been bad "for the last 30 years" and the decision to separate was not based on a recent disagreement over the dental practice. At trial, Lyle stated he did not want to live with his wife, he did not like when she visited him, he did not think their relationship could be restored, and he understood a divorce would permanently end his marriage to Joann. This evidence was certainly sufficient to support the trial court's finding irreconcilable differences existed. As noted earlier, the evidentiary showing in the *Higgason* case was much less.

Joann is critical of the lack of "direct evidence" on this issue and that Lyle's subjective opinion on the irreconcilability cannot be the basis for the judge's decision. Not so. The trial court is the arbiter of the credibility of the witnesses, and it was entitled to believe Lyle's testimony. As stated, "the court must depend to a considerable extent upon the subjective state of mind of the parties" in deciding whether irreconcilable differences exist between the parties to a marriage dissolution petition. (*Walton, supra*, 28 Cal.App.3d at p. 117.) Contrary to Joann's theory, we conclude a marriage can break down without direct evidence of an affair or identifiable major disagreement between the parties. Ending one's marriage is recognized as having an "intensely personal quality." (*Straczynski, supra,* 189 Cal.App.4th at p. 540.) And just as fault is not a relevant consideration, direct proof of objective reasons supporting why one party subjectively believes the marriage is past saving is not required.

31

## III

The order is affirmed.  Respondent shall recover his costs on appeal.


O'LEARY, P. J.

WE CONCUR:


RYLAARSDAM, J.


IKOLA, J.

Filed 6/26/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of JOANN and LYLE B. GREENWAY. | |
| JOANN GREENWAY, Appellant, v. LYLE B. GREENWAY, Respondent. | G045949 (Super. Ct. No. 10D005024) ORDER GRANTING REQUEST FOR PUBLICATION AND DENYING PETITION FOR REHEARING |

Attorney for Appellant has requested our opinion filed on June 3, 2013, be certified for publication. The request is GRANTED. The opinion meets standards for publication set forth in California Rules of Court, rule 8.1105(c). The opinion is ordered published in the Official Reports.

The petition for rehearing is DENIED.

O'LEARY, P. J.

WE CONCUR:

RYLAARSDAM, J.

IKOLA, J.

33