Filed 9/1/21  Marriage of Mirza CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| In re Marriage of HASEENA BANO MIRZA and IRFAN MUHAMMAD MIRZA. | |
| HASEENA BANO MIRZA,  Appellant,   v.  IRFAN MUHAMMAD MIRZA,  Appellant. | G057613, G057943, G058199, G058217  (Super. Ct. No. 16D002426)  O P I N I O N |

Appeals from four postjudgment orders of the Superior Court of Orange County, Andre De La Cruz, Judge.  Affirmed.

Law Office of Herb Fox, Herb Fox; Law Office of Adam N. Schanz and Adam N. Schanz for Appellant Irfan Muhammad Mirza.

Minyard Morris LLP, Mathew S. Buttacavoli; Snell & Wilmer, Todd E. Lundell, Jing (Jenny) Hua; Sheppard, Mullin, Richter & Hampton and Todd E. Lundell for Appellant Haseena Bano Mirza.

\* \* \*

In this consolidated appeal, Irfan Muhammad Mirza challenges both a family court pretrial evidentiary ruling and, after a three-day bench trial, the court's subsequent order denying his motion to set aside the stipulated divorce decree he entered into with Haseena Bano Mirza.[1] The family court entered the decree based on the marital settlement agreement (MSA) that Irfan and Haseena both signed. On appeal, in addition to denial of his set aside motion, Irfan also challenges the court's partial award of sanctions and attorney fees against him, but only as a protective appeal in the event we reverse on the substantive issues he raises. Haseena appeals the court's denial of attorney fees she incurred in defending against the set aside motion.

We find no basis to overturn the court's posttrial order denying his attempt to set aside the stipulated divorce decree on grounds of mental incapacity. The family court also did not apply an incorrect standard regarding his mental state in finding against him on his claim that duress vitiated the MSA.

Similarly, the court acted within its discretion in issuing its pretrial order which limited Irfan's attempt to argue claims of fraud, perjury, and disclosure omissions, given that the primary factual basis for Irfan's alleged "delayed discovery" of those claims was his failure to read the MSA he signed. The agreement spelled out in detail the terms of the couple's division of property and, as such, gave Irfan notice of the allegedly unequal and "unfair" allocation of assets that he alleged as the basis of his fraud, perjury,

---

[1] Because the parties share the same last name, we use their first names for clarity and ease of reference and intend no disrespect. (*Pont v. Pont* (2018) 31 Cal.App.5th 428, 431, fn. 1.)

2

and disclosure claims. Irfan signed the agreement, and the court entered it as the judgment, more than a year before Irfan filed his set aside motion. The court's finding that Irfan's new fraud claims were precluded because they fell outside the applicable statute of limitations was therefore correct as a matter of law.

Finally, as to fees, the court reasonably distinguished between Irfan's set aside motion based on his alleged lack of capacity due to depression, along with a related claim of duress, and fees for Haseena's subsequent motion to enforce the divorce decree, after Irfan failed to have it vacated. We therefore affirm in their entirety the court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

Irfan, a cardiologist, and Haseena, a physician's assistant, married in 1997 before they began their careers; the couple lived in New York until Irfan completed his residency three years later. They then moved to the Laughlin-Bullhead City area, where Irfan set up his cardiology practice. The Mirzas had two sons over the next five years while Irfan expanded into a larger practice with four partners and offices in Arizona, Nevada, and California.

In 2012, Irfan left the partnership and returned to his own practice. This preceded his former partners filing complaints against him in 2013 with the Arizona Medical Board, alleging he performed unnecessary procedures. In 2013, one of the partners also filed a lawsuit against him in Nevada, with claims that are not specified in our record. In reviewing his practice records around this time, Irfan discovered he had made an error in treating a patient, which concerned him because of his position as chief of cardiology.

Irfan became depressed in the wake of these events in 2012 and 2013, but his testimony was inconsistent on the timeline with respect to his mental state. He testified that his depression did not manifest itself—on a self-assessed scale of 1 to 10—

3

above "1" until December 2014; he also testified that his "recovery started in 2014." According to Irfan, this recovery allowed him to function well enough to provide "answers to the [medical] board and [engage in unspecified] communications start[ing] in 2014." Irfan nevertheless described his condition into late 2014 as feeling "really, really low."[2]

In the summer of 2015, Irfan admitted to Haseena that he had an extramarital affair in 2009. Haseena was furious and told Irfan she wanted a divorce. She moved with their two boys in August 2015 to California. Irfan initially objected, but then helped her pack for the move; this included their financial records related to property and bank accounts.

Before she left, Haseena and Irfan discussed his "anxiety and stress," and she told him he needed help. She arranged for Irfan to meet with several therapists and a life coach. She also arranged for him to obtain a prescription for Prozac.

Irfan visited his sons "every week" in California; on a visit in March 2016, he learned Haseena remained intent on divorce. According to Irfan, she had "made up her mind. . . . She [then] gave me [unspecified] papers" pertaining to divorce, which he signed. He did not read the papers. Irfan claimed that "[e]ven though the papers were not filed," he was then "asked to leave" because Haseena viewed the marriage as over, stating, "You're not married to me anymore." Haseena filed for dissolution of marriage on March 17, 2016.

---

[2]     The evidentiary record from the three-day trial on Irfan's set-aside motion is largely from his perspective because, after his case-in-chief, the court granted Haseena's oral motion for judgment. (Code Civ. Proc., § 631.8.) As we discuss, the court eventually found Irfan, on the evidence he presented, "unable to meet his burden of persuasion even by [the] preponderance standard." The court in particular noted that Irfan did not read the legal agreement he was attempting to set aside (the divorce decree). Irfan testified instead that, regardless of his mental condition, he "hadn't read a single one [that he signed] in [his] entire life."

Irfan admitted he and Haseena talked that day in her home about dividing their assets, and he characterized their communication over the next seven or eight months about matters related to their divorce as nearly "every day" occurrences. These frequent discussions continued into November 2016 when Irfan signed a stipulated divorce decree. During those interim months, the parties discussed in detail the division of their properties, though they did not attempt to assign a market value to each. Irfan acknowledged he knew of the proposed allocation of assets, but testified, "I did not discuss what she said I agree to it. Because she was telling me 'I want this, I want this, I want this.'"

According to Irfan, after the divorce proceedings began in March 2016, his depression deepened and he "lost interest in everything." The parties disputed how much Irfan continued to work throughout the year, in spite of his allegedly debilitating depression. Irfan acknowledged he continued to treat "a lot" of patients in his cardiology practice, an average of "12 to 15 per day," including over 900 new patients, while also reviewing over 1,000 echocardiograms. He testified that he stopped performing "complex" procedures, implying this was a result of his depressed condition.

Haseena encouraged Irfan to retain his own counsel for the divorce, as he had done for the medical board proceedings and matters related to his practice. Nevertheless, he declined to hire an attorney. According to Haseena, Irfan admitted to her several more sexual liaisons in addition to the one he testified about in 2009 and, because he "was remorseful and felt guilty," he repeatedly told her to "'take everything'" anytime she "attempted to discuss the [prospective stipulated] judgment and specific assets to be divided[.]" Still, she persisted in addressing each asset with him.

Irfan signed the stipulated divorce decree at his home on November 7, 2016. According to Haseena, she e-mailed the proposed decree to him the week before, and when Irfan admitted he had not read it, she urged him to do so. He did not seek help

5

from his office manager, his brother (who knew about his extramarital affairs), or anyone else.

Haseena informed Irfan her mother would bring the stipulated decree to his house for him to sign along with a notary. Irfan testified he signed the document without reading it. He said he spoke to Haseena by telephone that morning, in hopes of reconciling, but she refused. Instead, she told him that if he did not sign the document, her mother would go to his office and "tell them everything," meaning that she would disclose the affair he had. According to Irfan, he signed the stipulated decree because he "just want[ed] to get it over with," and felt he "had no choice" because he did not want others to know about his affair.

Irfan asked his brother to leave his home before his mother-in-law and the notary arrived but remembered his brother's instructions to make a copy of the decree. Irfan attempted to make copies but found the feeder on his copier "was not working." So he "just made [a copy of] one page, most likely the last page of the documents . . . where my signature was." Irfan did not read or review the documents while he had them upstairs. He claimed, "I did not have the strength to stay there. I wanted people to leave."

Irfan suggested in his testimony that he would not have been able to understand the decree, including its property division and custody provisions, if he had read it. He testified he did not in fact understand it when he later obtained a copy from Haseena by e-mail. This was because, to the day he testified, he had "never read any contract in my life. People do it for me." He added, "It just happened that way. People in my practice, people were there who will read the contracts. They will tell me that there is nothing objectionable or [if there is an] objection, they will deal with it and ask me to sign it, [and] I sign it." When he testified, "I never read any contract. I sign it," the trial court asked him, "Did you just say 'I never read any contract. I just sign it?" Irfan answered, "Yes."

6

The stipulated divorce decree was entered as a judgment on December 2, 2016. Later that month, on December 19, 2016, Irfan hired a lawyer to represent him in a California Medical Board proceeding that arose after he was disciplined by Arizona's board.

When Irfan testified about hiring the lawyer for the California proceeding involving his medical license, the trial court asked him, "Wait, wait, wait. The retainer agreement, you agree you signed a retainer agreement [in] December, 2016? Is that what you just said?" The court added: "December, 2016 when you were a 10 out of 10 on your depression scale," and Irfan answered, "Yes. Yes."

The parties through the remainder of the trial presented and argued conflicting evidence on how debilitating Irfan's claimed depression was at the time he signed the stipulated divorce decree in November 2016 through finally filing his set aside motion in February 2018. The dispute focused on Irfan's own testimony measured against evidence he treated up to three dozen patients a day, entered into agreements during that time with the Arizona and California medical boards to retain his medical license, and the fact he complied with the Arizona board's requirement that he complete an EKG training course.

Haseena also pointed to evidence that Irfan affirmatively reached out to her in December 2016 to discuss their finances, including tax issues and the sale of properties, and that he took steps over the ensuing months to comply with the terms of their stipulated agreement. For example, he contacted Ameritrade to transfer an account to her name, signing and faxing the requisite documents, and he discussed with her the requisite payments for a vehicle allocated to her by the decree.

Irfan called three lay witnesses at the trial, each of whom attested to his depressed state based on their observations of his conduct and appearance. Two of the witnesses were friends and colleagues Irfan knew from the hospitals where he worked, one an internist and the other a pulmonologist. The third witness was an acquaintance

7

who managed a convenience store Irfan frequented until he "disappeared" in 2015, then reappeared in a shockingly disheveled state in 2016. This witness also attended the same mosque as Irfan and confirmed Irfan slept at the mosque for more than a year during this time. According to Irfan, his depression did not abate to a "5" and lift enough for him to grasp the meaning of the divorce terms he agreed to until the "summer of 2017."

In February 2018, more than a year and a half after Irfan signed the MSA and the family court entered it as the judgment in the parties' divorce, Irfan filed a motion requesting that the court set aside the stipulated decree. Following a three-day trial on the motion, the trial court denied it. Irfan challenges that ruling on appeal, in addition to an evidentiary ruling the court made at the outset of the trial.

## DISCUSSION

1. *Motion in Limine*

Irfan challenges the trial court's ruling in favor of Haseena on the first day of trial, restricting his ability to present evidence on claims of fraud, perjury, and disclosure omissions because those claims fell outside the statute of limitations. The court did not err.

Irfan added the fraud, perjury, and disclosure claims to his motion to vacate the divorce decree by filing supplemental points and authorities regarding the new claims in June 2018. Discovery had already closed in anticipation of the then-scheduled July 6, 2018 hearing, but the court reset the date to allow Haseena to redepose Irfan regarding the new claims, including when he may have discovered them. When Irfan initially refused to be deposed again, the court ordered his compliance. Upon redeposing Irfan, Haseena filed a motion opposing the addition of the new claims as a basis for Irfan to set aside the stipulated divorce decree. She styled the motion as her "Motion in Limine No. 4."

8

Haseena's core contention in the motion was that, "[b]ased on the testimony obtained at [Irfan]'s deposition, these three newly pled claims are time-barred as a matter of law and no facts exist sufficient for [Irfan] to overcome the statute of limitations." It appears Haseena filed the motion about a month before the rescheduled December 2018 trial date.

As Irfan correctly notes, motions in limine are disfavored as a case management tool to resolve causes of action in lieu of dispositive motions like a demurrer or motions for summary judgment or summary adjudication. (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593 (*Amtower*); *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 371 (conc. opn. of Rylaarsdam, J.).) On the other hand, the motion here did not arise in the context of a civil complaint that Irfan proposed to—and received permission to—amend just before trial. A complaint or amended complaint ordinarily frames a party's motion for summary judgment or summary adjudication precisely because it sets out the pertinent factual allegations underlying each cause of action, including facts related to any limitations periods. Here, in contrast, Irfan added, by filing a new memorandum of points and authorities, three new claims to his request-for-order (RFO) motion to set aside the divorce decree. (Fam. Code, § 2122.)[3] Effective case management is difficult for both the trial court and the responding party in the face of such changing claims.

In any event, trial courts have wide discretion to manage their cases and, presumably for that reason, Irfan did not object to Haseena's motion in limine as procedurally improper. The court showed an initial willingness to entertain Irfan's belated new claims after the discovery cutoff date, moving the initial trial date on his behalf to accommodate Irfan. Yet the court then had to order Irfan to be redeposed on the

---

[3] Further undesignated statutory citations are to the Family Code or as indicated by the context of our discussion of other particular code sections.

9

claims.  Irfan does not dispute the court had ample authority to rule on the motion in these circumstances.

Moreover, as one court has observed, "it is not uncommon that as a case proceeds to trial and additional discovery is conducted, evidence is revealed which will either substantiate or disprove a cause of action." (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 701.)  In such cases, the trial court may "properly exercise[] its inherent powers over the proceedings by construing . . . motions in limine as a motion for judgment on the pleadings." (*Id.* at p. 702.)  Similarly, as Irfan concedes, the sometimes abbreviated nature of a motion in limine does not warrant reversal if the record shows the moving party was entitled to the favorable ruling as a matter of law.  (*Amtower*, *supra*, 158 Cal.App.4th at p. 1595.)  That is the case here.

By express statutory terms, a one-year limitations period applied to each of Irfan's new claims for fraud, perjury, and disclosure omissions.  (§ 2122, subds. (a), (b), (f).)  The statute provides that the party must bring the claim as a basis to vacate a divorce decree "within one year after the date on which the complaining party either discovered, or should have discovered" the alleged fraud, perjury, or failure to comply with spousal disclosure obligations.  (*Ibid.*)  In contrast, the claims underlying Irfan's original request to set aside the divorce decree—duress and mental incapacity (due to his alleged depression)—each had two-year limitations periods.  (§ 2122, subds. (c), (d).)  Irfan did not attempt to add his new fraud-related claims to his set-aside motion until June 13, 2018.  This was more than 18 months after the family court entered the stipulated decree in December 2016, and more than 19 months after Irfan signed the stipulation in November 2016.

As he did below, Irfan on appeal relies on the discovery rule to toll the commencement of the one-year limitations period.  This doctrine "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Nogart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397.)  The rule "is based on the

notion that statutes of limitations are intended to run against those who fail to exercise reasonable care in the protection and enforcement of their rights; therefore, those statutes should not be interpreted . . . to bar a victim of wrongful conduct from asserting a cause of action before he could reasonably be expected to discover its existence." (*Saliter v. Pierce Bros. Mortuaries* (1978) 81 Cal.App.3d 292, 297.)

Thus, in actions where the rule applies, the limitations period does not begin to run until the aggrieved party has notice of his or her alleged injury. (*Fox v. Ethicon Endo–Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*).) Under the "discovered, or should have discovered" statutory requirement (§ 2122, subd. (f)), the limitations period commences when the party knew or should reasonably have known that """someone has done something wrong" to him [citation].'" (*Unruh-Haxton v. Regents of University of California* (2008) 162 Cal.App.4th 343, 358.)

Legal knowledge is not a factor for assessing when a limitations period begins to run. Otherwise, "[a]ny plaintiff could simply allege ignorance of his or her legal rights against a particular defendant." (*McGee v. Weinberg* (1979) 97 Cal.App.3d 798, 804 (*McGee*).) Instead, "it is facts and events which inform a person that something is wrong and should be looked into, . . . rather than knowledge of its legal significance that starts the running of the statute of limitations." (*Call v. Kezirian* (1982) 135 Cal.App.3d 189, 197.)

"Resolution of the statute of limitations issue is normally a question of fact." (*Fox*, *supra*, 35 Cal.4th at p. 810.) This is because, under the knew-or-should-have-known standard, there generally are "no hard and fast rules for determining what facts or circumstances" will "render [a party] chargeable with knowledge" of his or her alleged injury. (*United States Liability Insurance Company v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 597.) "However, whenever reasonable minds can draw only one conclusion from the evidence, the question becomes one of law." (*Snow v. A.H. Robins Co.* (1985) 165 Cal.App.3d 120, 128.) In such instances, "[w]here the pertinent facts are

11

undisputed, it is a question of law whether a case is barred by the statute of limitations. Accordingly, we apply the de novo standard of review." (*Arcadia Development Co. v. City of Morgan Hill* (2008) 169 Cal.App.4th 253, 260-261.)

One of the core flaws in Irfan's invocation of the discovery rule is that he relies on things *he* did or did not do as the basis for his failure to appreciate, i.e., "discover," the harm he says Haseena inflicted on him. That harm, as best we can discern, is the allegedly unequal division of assets in the divorce decree. But it is difficult for us to fathom how Irfan's own actions and omissions qualify him for application of the discovery rule. If courts were to sanction a party's claimed ignorance of alleged harm based on things he or she—rather than a third party—has done or not done, that would encourage the type of gamesmanship which the law forbids. (Cf. *McGee*, *supra*, 87 Cal.App.3d at p. 804.) In effect, the party would be able to manufacture or contrive an obliviousness to harm that is inconsistent with the tolling rationale of the discovery rule.

A party's "cho[ic]e not to read or take the time to understand [binding legal] provisions is legally irrelevant." (E.g., *Harris v. TAP Worldwide, LLC* (2016) 248 Cal.App.4th 373, 384 [arbitration provisions].) It is well-settled that a party who signs a document is presumed to have read it and to understand its contents. (*Baker v. Italian Maple Holdings, LLC* (2017) 13 Cal.App.5th 1152, 1162-1163, fn. 6; *Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1588-89; *Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 163; *Estate of Johanson* (1943) 62 Cal.App.2d 41, 54.)

More fundamentally, Irfan's attempt to invoke the discovery doctrine is flawed because he never establishes how Haseena's alleged fraud, perjury, or disclosure violations harmed him when he did not read the allocation of assets he agreed to when he signed the stipulated decree. Irfan never explains in his briefing the basis of his fraud or perjury claims, contrary to the specificity in pleading required for fraud-based causes of action. (E.g., *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 645 (*Lazar*).) At best, Irfan

suggests that his claims are based on "falsified disclosure[] documents prepared not by Irfan, but by Haseena and her attorney."

We are unable to discern from Irfan's briefing specifically how or why he believes the documents were false as to any specific disclosures of assets made or not made.[4] Irfan gives no particulars as to any assets or disclosures allegedly misstated. In any event, Irfan's fundamental complaint seems to be that the *overall* "unequal division of community property" was allegedly "unfair." That division, however, was made in the stipulated agreement, not in any of the disclosure documents.

This distinction is important. As Haseena correctly observes, the facts Irfan "claimed he later learned" that revealed the injury inflicted upon him—the allegedly unequal division of assets—"were self-evident in the document right in front of him" when he signed the stipulated decree.

In sum, the MSA that Irfan failed to read divided the parties' assets. His own failures cannot logically furnish a basis for invoking application of the discovery doctrine because that turns the knew-or-should-have-known standard on its head. Parties should read documents before they sign them, and, in any event, upon signing they are presumed to know the terms therein, and they are bound by those terms.

Irfan's fraud-based fraud, perjury, and nondisclosure causes of action required that he allege and prove, as essential elements of his claims, both "justifiable reliance" and damage "resulting" from the alleged fraud, i.e., causation. (*Lazar*, *supra*, 12 Cal.4th at p. 638.) To the extent Irfan based his claims on Haseena or her attorney allegedly preparing *Irfan*'s disclosure documents or her own, Irfan cannot reasonably allege he relied on alleged misrepresentations or misstatements in those documents given that he did not read them, and therefore did not rely on anything stated in them. Nor can

---

[4]     "'The appellate court is not required to search the record on its own seeking error.'" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

13

the disclosures—whatever they were—be said to have *caused* his alleged harm, the purported unequal division of assets, because the disclosures did not purport to make that division. Instead, the division was accomplished in the couple's MSA, which Irfan also did not read. The divorce decree based on the MSA allocated the couple's assets in the manner they expressly assented to with their signatures.

Consequently, in failing to allege reliance or causation regarding disclosures he did not read, Irfan failed to plead fraud-based elements essential to his fraud, perjury, and disclosure claims. He similarly failed to establish for application of the discovery doctrine that he did not have any reason to know of the alleged harm the MSA's division of assets caused him—by virtue of terms he did not read. For all of these reasons, the discovery doctrine gave Irfan no tolling safe harbor from the statute of limitations. Therefore, the court did not err in granting Haseena's motion in limine precluding further litigation of Irfan's three belated claims.

2. *Set Aside Motion*

Irfan argues that in denying his attempt to set aside the stipulated divorce decree, the trial court "misapplied the law [as] to whether [he] had the mental capacity to execute the MSA . . . and whether Haseena's conduct amounted to duress . . . ." Irfan interweaves these arguments; neither has merit.

As to mental capacity, Irfan asserts the court erred by "*exclusively* apply[ing] the standards for mental capacity set forth in Probate Code §§ 810 et seq." (Irfan's italics), without also considering Civil Code section 39, subdivision (b). As to duress, Irfan argues the trial court "Applied Too Narrow a Definition," wrongly applying an objective standard rather than assessing Irfan's subjective mental state in response to the alleged duress. The record does not support Irfan's claims.

The trial court correctly observed that the Family Code does not define mental incapacity, generally, nor in the code provision under which Irfan sought to set aside the divorce decree. Section 2122 specifies the statutory "grounds . . . to set aside a

14

judgment," and simply lists "Mental incapacity" and "Duress" among them, but it does not elaborate on the terms. (§ 2122, subds. (d) & (c).) Accordingly, courts look to caselaw and other relevant statutory provisions for guidance to construe undefined terms. The trial court here cited in its ruling the very case that Irfan describes as "[p]erhaps the most instructive . . . on mental capacity in a marital setting," *Marriage of Greenway* (2013) 217 Cal.App.4th 628 (*Greenway*).

*Greenway* indicates "mental capacity can be measured on a sliding scale, with marital capacity [to enter or dissolve a marriage] requiring the least amount of capacity, followed by testamentary capacity, and on the high end of the scale is the mental capacity required to enter contracts. The burden of proof on mental capacity changes depending on the issue; there is a presumption in favor of the person seeking to marry or devise a will, but not so in the context of a person executing a contract." (*Greenway*, *supra*, 217 Cal.App.4th at p. 639.)

*Greenway* observed "[t]he basic starting point for any mental capacity determination is the Due Process in Competence Determinations Act found in [the] Probate Code," including as relevant here, Probate Code sections 810 and 811. (*Greenway, supra*, 217 Cal.App.4th at p. 640.) *Greenway* also identified "more specific guidelines for determining the capacity to contract" that may govern, but only "'**if** the person is substantially unable *to manage his or her own financial resources or resist fraud or undue influence*.'" (*Id.* at p. 642 [quoting Civ. Code, § 39, subd. (b)], underlining and bolding added, italics added by *Greenway*.)

As recognized by the trial court, Probate Code section 810 establishes a "rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions." (*Id.*, subd. (a).) This language and the title of section 810 reflect the Legislature's intent that this presumption applies to all persons, including those "with mental or physical disorders." The statute specifies that "[a] person who has a mental or physical disorder may still be capable of

15

contracting, conveying, marrying, making medical decisions, executing wills or trusts, and performing other actions." (*Id.*, subd. (b).)

The Legislature also specified that to make "[a] judicial determination" that a person "suffers from one or more mental deficits so substantial that, under the circumstances, the person should be deemed to lack the legal capacity to perform a specific act," the court's decision "should be based on evidence of a deficit in one or more of the person's mental *functions* rather than on a diagnosis of a person's mental or physical disorder." (Prob. Code, § 810, subd. (c), italics added.) The Legislature thus indicated the decisionmaker's focus should not rest on labels, but must be based on the person's actual ability to function mentally.

Providing further guidance, Probate Code section 811 identifies specific areas of mental functioning that may be relevant to a mental capacity determination, including, "Orientation to time, place, person, and situation," "Ability to attend and concentrate," "Information processing," "Ability to understand or communicate with others," and "Ability to understand and appreciate quantities." (Prob. Code, § 811, subd. (a)(1)(B) & (C), (2), (2)(B) & (D).) As the trial court expressly noted, the statute provides that "Deficits" in "Thought processes" can be "demonstrated" by, among other examples, "Severely disorganized thinking," "Hallucinations," "Delusions," and "Uncontrollable, repetitive, or intrusive thoughts." (*Id.*, subd. (a)(3)(A)-(D).) As the court also noted, deficits in the "Ability to modulate mood and affect," as one might expect of a depressed person, "may be demonstrated by the presence of a pervasive and persistent or recurrent state of euphoria, anger, anxiety, fear, panic, depression, hopelessness or despair, helplessness, apathy or indifference, that is *inappropriate in degree to the individual's circumstances*." (*Id.*, subd. (a)(4), italics added.)

Irfan infers from the trial court's specific references to Probate Code sections 810 and 811 that the court failed to appreciate or properly apply the principles embodied in Civil Code section 39. We disagree. First, on appellate review generally, in

16

which it is the appellant's burden to demonstrate error (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566), the lower court "is presumed to be correct in its ruling and need not specifically state that it has considered all of the relevant factors enunciated in [a] rule . . . ." (*Dubois v. Corroon & Black Corp.* (1993) 12 Cal.App.4th 1689, 1696.) "The mere fact that the court did not explicitly refer to [a particular] rule . . . does not support the conclusion that it was ignored." (*Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 563.) Instead, we must make all presumptions in favor of the trial court's order and imply all findings necessary to support it. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

Second, the record belies Irfan's claim that the trial court did not consider Civil Code section 39. That section provides that in certain circumstances, a "person of unsound mind, but not entirely without understanding," may rescind a contract "made before the incapacity of the person has been judicially determined." (Civ. Code, § 39, subd. (a).) Specifically, the statute provides that "*if* the person is substantially unable to manage his or her own financial resources or resist fraud or undue influence," then a rebuttable presumption "that [the] person is of unsound mind" arises. (Civ. Code, § 39, subd. (b), italics added.) If the presumption, once established, is left unrebutted, the person may "extinguish" the contract by rescission. (Civ. Code, §§ 39, subd. (a), 1688, 1689, subd. (b)(7).)

When Haseena moved for judgment under Code of Civil Procedure section 631.8 at the close of Irfan's case in chief, the trial court gave him the opportunity to make what amounted to a closing argument. Irfan relied on Civil Code section 39. In particular, his attorney referenced the testimony he believed supported a determination Irfan was entitled to rescind the MSA because he was of unsound mind when he signed it, within the meaning of section 39.

The court responded, "This is the same testimony that . . . revealed that [Irfan] had entered into an attorney engagement agreement, settlements with [the]

17

Arizona Medical Board, settlement with [the] California Medical Board, entering judgment with Haseena, and yet this [last agreement] is the only agreement that he is attempting to collaterally undermine by way of mental incapacity; correct?" The court in its ruling specifically found the evidence at trial showed Irfan "had sufficient capacity to execute the [MSA] based on [his] task-specific conduct before, during, and after [he] executed [it]."

The court's comments and ruling in response to Irfan's argument under Civil Code section 39 indicate the court found he had not established his inability "to manage his or her own financial resources or resist fraud or undue influence," as section 39 requires for rescission. Irfan's claim that the trial court committed legal error by failing to consider Civil Code section 39 fails.

Irfan also challenges the substance of the court's ruling. Specifically, he contends the court's finding that his "depression was not 'inappropriate in degree to his circumstances' . . . is unreasonable and thus an abuse of discretion." In essence, Irfan contends his evidence required the court to find his depression was so debilitating at the time he signed the MSA that he was entitled to void it. Irfan argues the court could not reasonably make a contrary finding. He makes the same argument regarding duress. We are not persuaded.

"'The standard of review after a trial court issues judgment pursuant to Code of Civil Procedure section 631.8 is the same as if the court had rendered judgment after a completed trial—that is, in reviewing the questions of fact decided by the trial court, the substantial evidence rule applies.'" (*Medrazo v. Honda of North Hollywood* (2012) 205 Cal.App.4th 1, 10.) "Under that standard, our review begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below. [Citations.] . . . [W]e view the record in the light most favorable to respondent[], giving [her] the benefit of every reasonable inference and resolving all conflicts in [her] favor. [Citation.] '[I]t is not our role to

18

reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it.'" (*Williamson v. Brooks* (2017) 7 Cal.App.5th 1294, 1299-1300.)

In rejecting Irfan's claim of mental incapacity as a basis to set aside the parties' stipulated divorce decree, the trial court observed that such a motion is a "challenging" undertaking. In light of the presumptions under Probate Code section 810 and Civil Code section 39 that, respectively, "all persons have the capacity to make decisions," including those facing mental disorders, the court's observation was correct.

In granting Haseena's nonsuit motion under Code of Civil Procedure section 631.8, the court made further observations related to Irfan's mental state. The court stated, "In assessing . . . Dr. Mirza's individual circumstances in this case, yes, he was subjected to various medical [board] investigations by both the Arizona [and] California Medical Board[s]. Wife wanted a divorce. Those are life incidences that may result in someone being depressed, true. [¶] But is his reaction [there]to [of] such an inappropriate degree to those circumstances? I disagree, and in light of that . . . the Court will grant [Haseena's section 638.1] motion as [Irfan] is unable to meet his burden of persuasion even by [the] preponderance standard."

Irfan argues that the court's reference to his depressed reaction to his circumstances as not being "inappropriate" was an abuse of discretion because the evidence *required* the court to conclude he was so depressed and so debilitated by depression that he lacked legal capacity to validly sign the MSA. In other words, Irfan claims the trial court unreasonably minimized his depression by characterizing it as "not inappropriate" to the circumstances.

Again, we disagree. The context of the court's comments suggests the court was observing that, just as a person's "[o]rientation to time, place, person, and situation" (Prob. Code, § 811, subd. (a)(1)(B)) supports the presumption he or she is mentally sound and capable of making important decisions, the fact that a person's mood

19

is not inappropriate to his or her circumstances (*id.*, subd. (a)(4)) may also support the presumption.

In any event, the record shows the trial court considered Irfan's individual circumstances and mental state in concluding he was not so debilitated by depression as to lack capacity to enter into the MSA. The court cited Irfan's actions around the same time period recognizing the importance of retaining an attorney in his medical board proceedings, and participating in and defending his medical license in those proceedings, as well as other "task-specific conduct before, during, and after [he] executed the judgment." The court observed that Irfan managed to take these measures when he claimed to be "10 out of 10 on your depression scale."

The court also noted during Irfan's testimony that while he claimed, "'I have very little recollection of what occurred between the time Haseena filed for divorce . . . and the entry of [the] judgment,'" he then gave in nearly the same breath "explicit detailed testimony as to what happened on November 7, 2016," when he claimed Haseena coerced him into signing the MSA with a threat to expose his infidelity. The court's comments reflect the fact that it did not believe Irfan's claim that his depression was so debilitating it rendered him without legal capacity to enter the MSA, nor that duress vitiated the agreement. That was the court's prerogative as the trier of fact. While Irfan attempts to reargue the evidence on appeal in his favor, and explain away the contradictions in his testimony and his conduct, that is contrary to our standard of review. Substantial evidence supports the trial court's conclusion.

Nor does the record support Irfan's claim that the court improperly applied an objective standard regarding duress, rather than evaluating his subjective mental state in response to Haseena's alleged coercion. Specifically, Irfan challenges the court's conclusion that Haseena's alleged threat, on the morning he signed the MSA, to tell "'everybody [at his office] about your infidelity'" did not amount to duress. The court's ruling reflects that it found Irfan's claim of duress unsupported by the evidence. The

20

testimony at trial supported the court's conclusion. His challenge to the court's ruling therefore fails.

   3. *Attorney Fees*

   On March 5, 2019, following the trial court's entry of its written ruling after denying Irfan's set aside motion, Haseena filed attorney fee and sanctions motions. The attorney fee request accompanied Haseena's motion for an order to enforce the December 2016 stipulated divorce decree, including by determining spousal and child support arrearages under the decree, among other relief. The motion sought attorney fees for enforcing the divorce decree and defending against Irfan's attempt to vacate the decree—including to rescind it under Civil Code section 39 for his alleged lack of mental capacity.

   Haseena's sanctions motion invoked section 271 as an alternate basis for attorney fees and costs based on several allegations, including no "engage[ment] in settlement discussions," "Five frivolous claims," "gamesmanship," "unnecessary and costly evidentiary hearing," and "no evidence to support any claims." Section 271 by its terms provides for fees and costs on an alternative basis to other grounds for such awards and "[n]otwithstanding any other provision of this code." The sanctions award, if any, is based on "the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation," and its purpose is to "reduce the cost of litigation by encouraging cooperation between the parties and attorneys." (§ 271, subd. (a).)

   The trial court initially awarded Haseena $143,217 on her sanctions motion, but later reduced that amount to approximately $100,000. Among other relief it granted on Haseena's enforcement motion, the court awarded her more than $400,000 as the sum both parties agreed to in back spousal and child support. The court also ordered Irfan to pay Haseena attorney fees for the enforcement motion in an amount to be determined, "subject to proof." The court denied Haseena attorney fees "associated with [Irfan's]

21

motion to set aside" the divorce decree, on grounds that the motion "does not come within the purview of Section 12 of the stipulated judgment [, i.e., the MSA], and, therefore, that request is denied."

Irfan challenges the attorney fee and sanction rulings only "If" the court's underlying denial of his set aside motion "is Reversed for Any Reason." As discussed, we affirm the court's substantive rulings, so his attorney fee and sanctions challenge also fails.

Haseena challenges the court's denial of her request for fees for defending against Irfan's set aside motion. She argued the fees were incurred in "the action that we defended against [as] a necessary first prerequisite [to then moving for] enforcement" of the divorce decree. Irfan, in contrast, argues that "[i]n the absence of broad contractual language [in the MSA] providing for an award of attorney[] fees to the prevailing party in proceedings 'related to' or 'arising out of' the MSA," the trial court's ruling was correct.

Section 12 of the MSA, entitled "Costs of Enforcement," provides for an award of "reasonable attorney fees as set by the court" "in the event that either of the parties shall be required to bring any action or proceeding to enforce any of the provisions of this judgment . . . ."

Both parties overlook the fact that Irfan consistently predicated his request to set aside the decree on the standard set forth in Civil Code section 39, subdivision (a), for rescission of a contract. That standard authorizes rescission when a contracting party was "of unsound mind, but not entirely without understanding" when he or she entered into the contract. That same subdivision specifies rescission may be granted, as the applicable statutory remedy, "as provided in Chapter 2 (*commencing with Section 1688)* of Title 5 of Part 2 of Division 3." (Civ. Code, § 39, subd. (a), italics added.)

In turn, Civil Code section 1688 provides that "A contract is extinguished by its rescission," and Civil Code section 1692 spells out the relief available when rescission is sought, whether granted or denied. In particular, the trial court retains sound

22

discretion, even when "the court determines that the contract has not been rescinded," to "grant any party to the action any other relief to which he may be entitled under the circumstances." (Civ. Code, § 1692.) In short, the court "in its judgment [may] adjust the equities between the parties." (*Ibid.*)

Under this section, a party may succeed in rescinding a contract but still recover attorney fees under the rescinded contract. (*Pac. Fuel Co., LLC v. Shell Oil Co.* (9th Cir. 2011) 416 Fed. Appx. 607.) But by the same token, because an award of fees is by legislative command committed to the trial court's sound discretion, the court may deny fees, as it did here.

Haseena does not argue the court abused its discretion in denying fees, but only that she was entitled to fees under the MSA's contractual attorney fees provision. We find no abuse of discretion. Irfan's observation regarding the express language of the MSA—with reference to fees only for "enforce[ment]" and not in proceedings '"related to"' or '"arising from"' the MSA—supports the court's ruling.

Furthermore, implicit in the court's denial of fees is the conclusion that, while Irfan was not ultimately so depressed or vulnerable as to be of unsound mind, he made his motion in good faith. On this score, the court determined Irfan was in fact depressed, and had good reason to be, but that his depression did not rise to the level of rendering him legally incapacitated to enter into the MSA. In declining to award fees, the trial court implicitly concluded it did not want to chill good faith, albeit ultimately unsuccessful, claims of depressed mental functioning in making important contracts. The Legislature's express provision of rescission as a remedy for ensuring that agreements are contracted between parties whom are both of sound mind, together with the discretion the Legislature has afforded the court in crafting relief in litigation over such questions, supports the court's ruling. We therefore affirm the trial court's fee orders.

23

## DISPOSITION

The trial court's postjudgment orders are affirmed.  In the interests of justice, since both parties succeeded in defending the respective orders in their favor, no costs on appeal are awarded to either party.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.