Filed 11/29/22  Thomas v. Overland Terrace Healthcare etc. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| CARLISE THOMAS, | B310868, B312568 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 20STCV37010) |
| v. | |
| OVERLAND TERRACE HEALTHCARE & WELLNESS CENTRE LP, et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Terry A. Green, Judge.  Affirmed.

Zarmi Law and David Zarmi for Defendants and Appellants.

Garcia & Artigliere, Stephen M. Garcia, William M. Artigliere and David M. Medby for Plaintiff and Respondent.

————————————————

# INTRODUCTION

Overland Terrace Healthcare & Wellness Centre, LP (Overland Terrace), Rockport Administrative Services, LLC (Rockport) and Schlomo Rechnitz (collectively, appellants) appeal from orders denying their petitions to compel arbitration of the civil action filed by William Thomas, through his sister Carlise Thomas (Carlise[1]) as his "attorney in fact," against Overland Terrace, Rockport and Rechnitz. Thomas opposed the petitions on multiple grounds, including that he did not have the mental capacity to enter the arbitration agreements. The trial court properly ruled that the parties could not contractually delegate[2] the issue of Thomas's capacity defense to the arbitrator, and its finding that Thomas lacked capacity to enter the arbitration agreement is supported by substantial evidence. We therefore affirm.

---

[1] To avoid confusion, we will refer to plaintiff William Thomas as "Thomas" and to his sister Carlise Thomas by her first name only. No disrespect to Ms. Thomas is intended.

[2] The term "delegate" is derived from what is sometimes referred to as a "delegation provision," which has been described as "an agreement to arbitrate threshold issues concerning the arbitration agreement . . . such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." (*Rent-A-Center, West, Inc. v. Jackson* (2010) 561 U.S. 63, 68-69 [130 S.Ct. 2772, 177 L.Ed.2d 403].) In this context, "delegate" means the parties have agreed to have such threshold issues decided by the arbitrator instead of the court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Thomas Is Admitted to Country Villa

Thomas was admitted to a 24-hour skilled nursing facility known as Country Villa South Convalescent Center (Country Villa) on August 1, 2020.  Overland Terrace operates Country Villa; Rechnitz is allegedly the sole owner of Overland Terrace. Rockport allegedly operates Overland Terrace and is also owned by Rechnitz.

At the time Thomas was admitted to Country Villa, he was 56 years old.  Thomas's sister, Carlise, who was not present when Thomas was transferred to Country Villa, informed Country Villa staff that she had a medical power of attorney for Thomas and that he "was unable to sign documents for himself and suffered from mental retardation."

### B.     The Arbitration Agreement

The record contains a document bearing the title "arbitration agreement," dated August 4, 2020, between "Country Villa South" (designated as the "Facility") and "Thomas, William" (designated as the "Resident").  "WT" is written on the signature block for the Resident, on pages 4 and 5 of the agreement.  It is unclear whether this is purportedly Thomas's full signature, or only his initials.  The agreement contains a form to be filled out by a witness when a Resident uses a mark instead of a signature, but that form is blank.  A declaration signed by Aurea Hernandez, the Director of Admissions at Country Villa, states that she signed the arbitration agreement on behalf of the facility and that the agreement was in Thomas's file at Country Villa; the declaration does not state that Thomas signed the agreement, describe the circumstances under which Hernandez executed the

agreement, or state that Hernandez recalled executing the agreement.[3]

Appellants do not contend that Carlise, who held a medical power of attorney, agreed to the arbitration agreement on behalf of Thomas, or that the arbitration agreement was ever presented to her. While they assert that Carlise "gave Country Villa consent to treat [Thomas] 'over the telephone' " there is no contention that she ever agreed on his behalf to the arbitration agreement, which by its terms provides that it is "Not Part of Admission Agreement" and "Residents shall not be required to sign this arbitration agreement as a condition of admission to this facility." Thus, Carlise's oral consent to treatment cannot be considered assent to the terms of the arbitration agreement.

The arbitration agreement is not part of any other agreement, such as the admission agreement. It includes two primary arbitration provisions. The first requires arbitration of "any and all disputes or claims as to medical malpractice (that is, whether any medical services rendered during the Resident's

---

[3] The petition filed by Overland Terrace and Rockport indicated that Hernandez's declaration was being submitted in support, but the declaration itself is not included in the copy of the petition contained in the appellate record. However, it appears that the declaration was included with the petition filed in the trial court, as it is referenced in Thomas's opposition to the petition. A copy of the declaration is included in the record as part of a petition to compel arbitration filed by Rechnitz, who filed a separate petition because he did not appear in the case until after the court had ruled on the petition filed by Overland Terrace and Rockport. The date of the declaration is consistent with the petition filed by Overland Terrace and Rockport, so it is apparently the same declaration.

4

admission were unnecessary or unauthorized or were improperly, negligently or incompetently rendered or not rendered)." The second requires arbitration of "any and all disputes, controversies, demands or claims that relate or arise out of the provision of services or health care or any failure to provide services or health care by Facility, the admission agreement and/or this Agreement, the validity, interpretation, construction, performance and enforcement thereof, including, without limitation, claims that allege: medical malpractice; breach of contract; unpaid nursing home charges; fraud; deceptive trade practices; misrepresentation; negligence; gross negligence; Health and Safety Code section 1430 claims; violations of the Elder Abuse and Dependent Adult Civil Protection Act, the Unfair Competition Act, the Consumer Legal Remedies Act; and/or any right granted to Resident by law or by the admission agreement."

In addition, in the "Recitals" section, the agreement provides: "The arbitrator, and not any federal, state, or local court or agency, shall have the exclusive authority to resolve any Dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable."

The arbitration agreement states in two places that agreeing to arbitration is not a condition of admission to the facility.

### C. Thomas Is Hospitalized After Having Seizures and Then Sues Overland Terrace, Rockport and Rechnitz

On August 14, 2020, Thomas suffered seizures at Country Villa and was taken to the hospital.[4]

On September 28, 2020, Thomas, acting through his sister Carlise as an "attorney in fact," sued Rechnitz, Overland Terrace and Rockport for dependent adult abuse (Welf. & Inst. Code, § 15600 et seq.) and negligent hiring and supervision.[5] The complaint alleges that Thomas "suffered from high functioning Intellectual Disability since birth" (fn. omitted) and had been diagnosed with a seizure disorder, diabetes, congestive heart failure, and stage III kidney failure. It further alleges that staff at Country Villa failed to administer Thomas's seizure medication, which resulted in Thomas suffering four seizures on August 14, 2020; Thomas was taken to the hospital where he was placed on a ventilator and was unresponsive.

On October 5, 2020, Thomas filed a motion for a preference in trial setting pursuant to Code of Civil Procedure section 36, subdivision (d).[6]

---

[4] On September 22, 2021, Thomas's attorneys filed a notice in this court that Thomas had recently died. We granted Carlise's subsequent motion to be substituted as respondent in place of her brother. Carlise's declaration in support of this motion, and the attached death certificate, indicated that Thomas died on September 17, 2021.

[5] Thomas also named Overland Terrace Wellness GP, LLC as a defendant, but later dismissed that entity from the suit.

[6] Code of Civil Procedure section 36, subdivision (d) provides that a trial court has discretion to grant a trial

6

### D.    Overland Terrace and Rockport File a Petition to Compel Arbitration

On November 2, 2020, Overland Terrace and Rockport[7] filed a motion to compel arbitration. Overland Terrace and Rockport argued that the Federal Arbitration Act (FAA; 9 U.S.C. § 1 et seq.) applied because Country Villa participates in the Medicare program and therefore its services affect interstate commerce. In support of this argument, Overland Terrace and Rockport noted that the arbitration agreement states that " '[t]he Facility, among other things, participates in the Medicare and/or Medi-Cal programs and/or procures supplies from out-of-state vendors,' " and that it " 'shall be construed and enforced in accordance with and governed by the [FAA] and the procedures set forth in the [FAA] shall govern any petition to compel arbitration.' "

Overland Terrace and Rockport argued that Thomas's causes of action fell within the scope of the arbitration agreement.

Thomas filed an opposition to the motion. The opposition argued that Thomas lacked mental capacity to sign the arbitration agreement. The argument relied on medical records from Country Villa, including the following: (1) a "Cognitive Loss" care plan for Thomas, apparently created on August 1,

---

preference if it "concludes that one of the parties suffers from an illness or condition raising substantial medical doubt of survival of that party beyond six months," and a trial preference serves the interests of justice.

[7] At that time, Rechnitz had not appeared in the case and had not yet been served with the summons and complaint.

7

2020, which stated as a "Problem/Need" that Thomas had "[a]ltered through process related to: . . . Periods of confusion[;] Periods of disorientation[;] [and] Periods of forgetfulness," was "[u]nable to make decision[s]" and had "[p]oor judgment"; (2) a "Consent to Treatment" form dated August 1, 2020, which indicated that Thomas was "unable to sign" and that "verbal consent" had been obtained from Thomas's sister, Carlise; (3) an August 2, 2020, evaluation by a doctor at Country Villa in which the doctor checked a box indicating that "[t]his resident . . . does **NOT** have the capacity to understand and make decisions";[8] (4) a nursing note dated August 2, 2020, which stated "client is unable to sign & make decisions for himself due to cognitive status[.] [C]lient experiences mental retardation[.]  Called power of attorney Charlise Thomas and explained the pts plan of care and current status"; and (5) other forms indicating that Carlise's consent to treat Thomas had been obtained in lieu of Thomas's signature.

In a declaration submitted in support of the opposition, Carlise stated that, on September 1, 2010, Thomas had executed a power of attorney designating her "as his health care agent should he be unable to make his own healthcare decisions," and Thomas had not revoked the document.[9]  She further stated that

---

[8] The form had two other options: "[t]his resident . . . has the capacity to understand and make decisions," and "[t]his resident . . . can make needs known but can not make medical decisions."

[9] The power of attorney document, which was attached to Carlise's declaration, states in relevant part that Thomas appointed Carlise "[a]s my agent to make any and all health care

she had informed staff at Country Villa that Thomas "was unable to sign documents for himself and suffered from mental retardation" and that, as a result, Country Villa staff contacted her by telephone to obtain her consent "for various issues that arose related to his admission at the facility."  With respect to the arbitration agreement, Carlise stated in her declaration, "Due to my brother's cognitive deficit and mental retardation, it would have been impossible for my brother at that time to have understood what an arbitration agreement was or what he was signing.  As his power of attorney for healthcare matters, I was at that time, and had been for many years prior, the person who was responsible for making decisions on his behalf regarding health care matters, including whether my brother would have wanted to enter into an arbitration agreement whereby he would be waiving his constitutionally protected right to a jury trial."

The opposition also argued that there was no evidence that the apparent initials "WT" on the arbitration agreement were placed there by Thomas and, as a result, Overland Terrace and Rockport had failed to carry their burden of showing the existence of an arbitration agreement.

Finally, the opposition argued that the arbitration provision was unconscionable as a result of evidence, from other arbitrations, that Rechnitz, Overland Terrace and Rockport would seek to bar discovery in the arbitration proceeding.

Overland Terrace and Rockport filed a reply brief.  They first argued that the arbitration agreement contains a delegation

---

decisions for me, except to the extent I state otherwise in this document.  This Medical Power of Attorney takes effect if I become unable to make my own health care decisions and my physician certifies this fact in writing."

provision which requires any disputes regarding the formation of the arbitration agreement itself to be decided by the arbitrator. They also argued that Thomas's apparent capacity to enter the power of attorney agreement showed he had capacity to contract, and there was no admissible evidence Thomas lacked capacity to contract on the day the arbitration agreement was executed. They further argued that Thomas's claim he lacked capacity to contract was contradicted by the contention, made by Thomas's counsel in their reply brief in support of the motion for trial preference, that Thomas "has capacity and is able to communicate just not verbally. In fact [Thomas] executed the declaration in support of Plaintiff's Opposition to the Petition to Compel Arbitration himself."[10] Overland Terrace and Rockport submitted several medical records which they claimed showed Thomas was alert and oriented on days before, on and after the date the arbitration agreement was signed, and one medical record he signed in January of 2019.

Relying on Probate Code section 811, subdivision (d), Overland Terrace and Rockport argued that "the mere diagnosis of a mental or physical disorder is not sufficient to determine a person is of unsound mind. [Thomas] has not attached an expert declaration to decipher and opine on the medical records, or the impact of or diagnosis provided to [Thomas]."

Finally, Overland Terrace and Rockport argued that the arbitration agreement was not procedurally unconscionable because it was clear from the agreement's language that

---

[10] There is no declaration by Thomas in the record, and the opposition to the petition to compel arbitration does not indicate that any declaration from Thomas was submitted in support.

10

residents were not required to sign it, and it was not substantively unconscionable because it did not state that discovery was not allowed in the arbitration proceeding.

## E.    Proceedings in the Superior Court

The court held a hearing on the petition to compel arbitration and the motion for trial preference on December 7, 2020, at which it ordered Thomas to obtain a supplemental declaration from his medical expert, Shahab Attarchi, M.D., to include the foundation for Dr. Attarchi's summary of Thomas's medical history. Dr. Attarchi prepared a supplemental declaration which was submitted on January 4, 2021.

On January 6, 2021, the court continued the hearing on the motions to January 28, 2021, and invited the parties to file supplemental briefs on the issue whether a party's capacity to contract can be contractually delegated to an arbitrator.

Overland Terrace and Rockport filed a supplemental brief, in which they argued that the arbitration agreement "clearly and unmistakably" delegates to the arbitrator issues regarding the formation of the agreement itself, and that such formation issues, including a claim of lack of capacity, can legally be delegated to an arbitrator. Thomas filed a supplemental brief which argued that a claim that an arbitration agreement was never formed must be decided by the court, and cannot be delegated to an arbitrator.

On January 28, 2021, the court held a hearing on Overland Terrace's and Rockport's petition to compel arbitration and Thomas's motion for a trial preference. The next day, the court issued a written ruling denying both the petition and the motion for a preference in trial setting.

11

With respect to the petition to compel arbitration, the court first addressed whether the parties could delegate to the arbitrator the two defenses Thomas was raising, namely, that he lacked capacity to enter the arbitration agreement and that the agreement was unconscionable. Relying on *Tiri v. Lucky Chances, Inc.* (2014) 226 Cal.App.4th 231, 242, the court concluded that the question whether the arbitration agreement was unconscionable could be delegated to an arbitrator. However, the court concluded that the issue whether a party had capacity to enter the arbitration agreement could not be delegated to an arbitrator because "the issue of capacity goes to the existence of mutual assent."

The court then concluded that Thomas lacked capacity to enter the arbitration agreement, so the agreement was "VOID" (or there was no agreement formed). It first noted the lack of evidence regarding the circumstances under which Thomas supposedly signed the agreement, and the lack of an "official assessment of capacity from that date." It then summarized the medical records submitted by Overland Terrace and Rockport as suggesting that Thomas was "alert and responsive" on days before and after August 4, and the records submitted by Thomas as showing he was "confused and unable to make decisions" during that time. The court found "salient" the declaration of Thomas's sister, Carlise, wherein she stated that Thomas had made her his agent for health care purposes, she informed the staff at Country Villa of this and they referred decisions to her, including consent for admission and treatment, approval of the care plan and authorization for life-support, if necessary. Based on this evidence, the court stated, "it appears that [d]efendants [Overland Terrace and Rockport] themselves acknowledged

12

[Thomas's] lack of capacity in August of 2020. If he had capacity, the facility would not have referred his decisions to his power of attorney." The court also stated, "[t]he record before the court contains one formal evaluation of capacity performed by a physician on August 2, 2020. That evaluation indicates that [Thomas] lacked capacity. . . . The conclusion of [d]efendants' own physician, on the spot, is persuasive here."[11]

The court rejected the arguments made by Overland Terrace and Rockport that Thomas took inconsistent positions regarding his competence by claiming he had capacity to execute the power of attorney form and claiming he had capacity to proceed in his lawsuit.

As to Thomas's motion for a trial preference, the court concluded that there was not clear and convincing evidence that Thomas was likely to die within six months. The court found that both sides' experts were credible and both made good points, so the issue was a close one. Thomas's expert opined that Thomas was likely to die within six months based on Thomas's numerous health problems, while the defense expert opined that Thomas could survive based on the fact he had survived for years with many of the same health problems. The court further concluded that, even if Thomas was not likely to survive six months, a preference in trial setting would not serve the interests of justice because Thomas would not be able to play a meaningful role in the litigation because of his medical and mental condition.

---

[11] Earlier in its decision, the court had stated that the "competing evaluations" of Thomas submitted by the parties "are not terribly helpful in the analysis here." However, the court was apparently not referring to the August 2, 2020, evaluation by the Country Villa physician, which it did find persuasive.

As the court explained, "[Thomas] himself will not be assisting his counsel in preparing the case. Given his mental disability, it is not clear that he could have done so on an ordinary day. But according to his own complaint, he currently lies unresponsive in the hospital." The court also addressed the argument made by Thomas's counsel that, if Thomas died, the burden of proof on his causes of action would be different and his potential recovery would be less. The court acknowledged that Thomas's potential damages would be less, although it disagreed that the burden of proof would be different, but in any event concluded that the interests of justice did not compel a preference in trial setting due to the difficulty Overland Terrace and Rockport would face in having to prepare for a trial in such a short time period.

On February 17, 2021, Overland Terrace and Rockport filed a notice of appeal of the court's denial of their petition.

## F. Rechnitz Appears in the Action and Files a Petition to Compel Arbitration

Rechnitz was served with the summons and complaint after the trial court denied the petition to compel arbitration filed by Overland Terrace and Rockport. Rechnitz then filed his own petition to compel arbitration, which relied on the same arguments and evidence as the prior petition. Thomas opposed Rechnitz's petition on the same grounds he had opposed the earlier petition. On April 21, 2021, the trial court denied Rechnitz's petition, incorporating its written ruling on Overland Terrace's and Rockport's petition. On April 30, 2021, Rechnitz filed a notice of appeal from the trial court's denial of his petition.

Overland Terrace, Rockport and Rechnitz filed a motion in this court to consolidate Rechnitz's appeal (No. B312568) with the appeal filed by Overland Terrace and Rockport (No. B310868).

14

We granted the motion, consolidating the two appeals for the purposes of the record on appeal, briefing, oral argument, and decision.

We affirm the trial court's rulings denying both petitions to compel arbitration. The trial court properly considered the issue of whether Thomas had capacity to enter the arbitration agreement, and its finding that Thomas in fact did not have capacity to enter the agreement is supported by substantial evidence and was not an abuse of discretion.

## DISCUSSION

Appellants challenge the court's ruling that the court, and not the arbitrator, should decide Thomas's claim he lacked capacity to enter the arbitration agreement, and they also challenge the court's conclusion Thomas lacked capacity.[12]

### A. Standard of Review

In deciding a petition to compel arbitration, "the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)

"If the superior court's decision regarding arbitrability is based on resolution of disputed facts, we review the decision for

---

[12] Appellants do not contend that Carlise agreed on Thomas's behalf to the arbitration agreement. Thus, we do not need to decide if Carlise's status as a holder of a power of attorney for medical decisions would have given her the authority to bind Thomas to an arbitration provision or whether, if she had such authority, it could have been exercised orally and be binding on Thomas without her signature on the arbitration agreement.

15

substantial evidence." (*Baker v. Italian Maple Holdings, LLC* (2017) 13 Cal.App.5th 1152, 1158, citing *Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653.) In such a case the appellate court " 'must accept the trial court's resolution of disputed facts when supported by substantial evidence; [the appellate court] must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of credibility of the witnesses and the weight of the evidence. [Citation.]' [Citation.]" (*Engineers & Architects Assn.*, *supra*, at p. 653.) However, " 'where the trial court's denial of a petition to arbitrate presents a pure question of law, we review the order de novo.' " (*Mendez v. Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 541.)

Here, the trial court's decision rested on a legal conclusion and a factual determination. The legal conclusion was that the parties could not delegate to the arbitrator the issue of whether Thomas had capacity to enter into the arbitration agreement in the first place. The factual determination was that Thomas did not have capacity to enter into the arbitration agreement. Therefore, we review the legal issue de novo and the factual issue under the substantial evidence standard.

## B. The Trial Court Properly Decided That It Should Rule on Thomas's Claim He Lacked Capacity to Enter the Arbitration Agreement

It is unclear whether appellants claim the FAA or the California Arbitration Act (CAA) applies. Neither party provides any specific arguments or authority on this point, and they cite to cases applying both the CAA and FAA.

16

The FAA applies to contracts "evidencing a transaction involving commerce." (9 U.S.C. § 2.) "Commerce" refers to interstate commerce. (*Tiri v. Lucky Chances, Inc.*, *supra*, 226 Cal.App.4th at p. 239 [FAA "governs only arbitration agreements that are part of written contracts affecting interstate commerce"].) At the trial court level, appellants argued that the arbitration agreement at issue here involves interstate commerce because Country Villa participates in the Medicare program, the agreement acknowledges this fact, and the agreement provides "[t]his agreement shall be construed and enforced in accordance with and governed by the Federal Arbitration Act and the procedures set forth in the (FAA) shall govern any petition to compel arbitration."

We need not decide whether the FAA or the CAA applies because the analysis and result are the same under both statutes. Under both statutes, the court is to decide whether there are grounds for rescission of the arbitration agreement. Specifically, under the CAA, "the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that: [¶] . . . [¶] . . . Grounds exist for rescission of the agreement." (Code Civ. Proc., § 1281.2, subd. (b); see *Engalla v. Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at p. 973 ["We construe [§] 1281.2, [subd.] (b), to mean that the petition to compel arbitration is not to be granted when there are grounds for rescinding the agreement"].) The FAA provides, in relevant part, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof . . . shall

be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . ." (9 U.S.C. § 2; see *Rent-A-Center, West, Inc. v. Jackson*, *supra*, 561 U.S. at p. 70 [an arbitration agreement "is valid under § 2 [of the FAA] 'save upon such grounds as exist at law or in equity for the revocation of any contract' "].) The California Supreme Court has noted that the difference between these state and federal provisions is "inconsequential." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 322.)

Under both statutes, the focus is on the arbitration agreement itself, and not on any broader agreement between the parties that contains the arbitration agreement. (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street*, *supra*, 35 Cal.3d at p. 322 [consistent with the FAA, under the CAA "the term 'agreement' may properly be construed to refer to the agreement to arbitrate, as distinguished from the overall contract in which that agreement is contained"]; see *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 445 [126 S.Ct. 1204, 163 L.Ed.2d 1038] ["as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract"].) In this case, the specific agreement at issue is a so-called "delegation provision," which is a clause in the arbitration agreement that provides for the arbitrator to decide whether the arbitration agreement as a whole is valid and enforceable.[13] "The delegation provision is an agreement to

_____

[13] This delegation provision, which is included in the "Recitals" section, states that the arbitrator has "exclusive authority" to resolve disputes relating to "enforceability" and

18

arbitrate threshold issues concerning the arbitration agreement. We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." (*Rent-A-Center, West, Inc. v. Jackson*, *supra*, 561 U.S. at pp. 68-69.) The delegation provision "is valid under § 2 [of the FAA] 'save upon such grounds as exist at law or in equity for the revocation of any contract.' " (*Id.* at p. 70.) This same analysis applies under the CAA. (*Tiri v. Lucky Chances, Inc.*, *supra*, 226 Cal.App.4th at pp. 240-241.) As a result, in considering this "gateway" question, the applicability of the FAA is not at issue as the outcome remains the same. (*Id.* at p. 239.)

In addition, under both the CAA and the FAA, a claim that challenges the formation of the contract that contains the arbitration agreement at issue must be decided by the court, and cannot be delegated to the arbitrator. (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 402, 406, fn. omitted [under both the FAA and CAA "the court may deny the application [to compel arbitration] if it finds the party resisting arbitration did not in fact agree to arbitrate"] (*Rosenthal*).) In *Rosenthal*, several plaintiffs opposed the defendants' petition to

---

"formation" of the arbitration agreement, among other issues. One of the primary arbitration provisions also arguably contains a delegation provision, in that it requires arbitration of "any and all disputes, controversies, demands or claims that relate or arise out of . . . this [a]greement, the validity, interpretation, construction, performance and enforcement thereof." This clause commingles the issue of arbitration of "the validity, interpretation, construction, performance and enforcement" of the arbitration agreement with other issues that must be arbitrated.

compel arbitration on the ground that the arbitration provisions they had agreed to were void for fraud in their execution. The defendants argued that the fraud claims were arbitrable under *Prima Paint Corp. v. Flood & Conklin Mfg. Co.* (1967) 388 U.S. 395 [87 S.Ct. 1801, 18 L.Ed.2d 1270] (*Prima Paint*). In *Prima Paint*, the court held "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." (*Id*. at pp. 403-404, fn. omitted.) Based on *Prima Paint*, the defendants in *Rosenthal* argued that a challenge to the formation of the parties' agreement was arbitrable unless it constituted "an 'independent' or 'separate and distinct' challenge to the arbitration clause itself." (*Rosenthal*, *supra*, at p. 415.) The court rejected this argument, concluding that "claims of fraud in the execution of the entire agreement are not arbitrable under either state or federal law. If the entire contract is void *ab initio* because of fraud, the parties have not agreed to arbitrate any controversy; under that circumstance, *Prima Paint* does not require a court to order arbitration." (*Id*. at p. 416.)

As the court explained, "The central rationale of the high court's decision in *Prima Paint* was that arbitration clauses must, under federal law established in the [FAA], be viewed as ' "separable" ' from other portions of a contract (*Prima Paint*, *supra*, 388 U.S. at p. 402 . . .); hence, fraud in the inducement relating to other contractual terms does not render the arbitration agreement unenforceable, even when it might justify rescission of the contract as a whole. By entering into the

20

arbitration agreement, the parties established their intent that disputes coming within the agreement's scope be determined by an arbitrator rather than a court; this contractual intent must be respected even with regard to claims of fraud in the inducement of the contract generally. [¶] Where, however, a party's apparent assent to a written contract is *negated* by fraud in the inception, there is simply no arbitration agreement to be enforced." (*Rosenthal, supra,* 14 Cal.4th at p. 416.)

*Rosenthal* applies to Thomas's claim he lacked capacity to enter the arbitration agreement because Thomas challenges the very formation of the arbitration agreement; although he does not specifically challenge the delegation provision, if he lacked capacity to enter the arbitration agreement then he could not have agreed to the delegation provision.[14] Notably, in *Rosenthal* one of the plaintiffs asserted a lack-of-capacity defense. The daughter and guardian ad litem of that plaintiff submitted a declaration stating that the plaintiff suffered from " 'severe memory loss, diminished understanding and [was] incapable of understanding complicated monetary transactions.' " (*Rosenthal, supra,* 14 Cal.4th at p. 430.) The court concluded that the "declaration, if believed, raise[d] a factual issue as to [the plaintiff's] capacity to contract; if extreme enough, her mental deficiency could render void any contract to which she apparently assented, including client agreements containing the arbitration clause. [Citation.]" (*Id.* at pp. 430-431.) Thus, it remanded the

---

[14] The only agreement appellants contend Thomas assented to is the arbitration agreement. The arbitration agreement was a stand-alone agreement, and was not part of the admission agreement or any other, broader agreement.

21

matter to the trial court to find the facts and decide whether the plaintiff's alleged incapacity rendered the contract void. (*Id.* at p. 431.)

Appellants rely on *Primerica Life Ins. Co. v. Brown* (5th Cir. 2002) 304 F.3d 469, 472 (*Primerica*) where the court held that under the FAA the arbitrator, and not the trial court, was required to decide the merits of the plaintiff's claim he lacked capacity to enter into the agreement at issue. The court concluded that *Prima Paint* applied to the lack-of-capacity claim because it was a defense to the entire contract and "not a specific challenge to the arbitration clause." (*Primerica, supra*, at p. 472.)

Appellants' reliance on *Primerica* is unavailing. First, the holding in *Primerica* that a lack-of-capacity defense must be decided by the arbitrator because it is a defense to the entire agreement is contrary to the holding in *Rosenthal*, where the court concluded that a defense which calls into question whether there was mutual assent to the contract that includes the arbitration agreement must be decided by the court. (*Rosenthal, supra*, 14 Cal.4th at pp. 416-417.)

Second, the reasoning used by the *Primerica* court is faulty and the decision has been rejected by numerous courts, beginning with *Spahr v. Secco* (10th Cir. 2003) 330 F.3d 1266 (*Spahr*).[15] In

---

[15] Although the United States Supreme Court has not addressed whether a lack-of-capacity defense can be delegated to an arbitrator, in *Buckeye Check Cashing, Inc. v. Cardegna, supra*, 546 U.S. at page 444, footnote 1, it noted "[t]he issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded." The court clarified that its opinion did not address challenges of the latter type, including "whether the signor

22

*Spahr*, the court distinguished the holding in *Prima Paint*, which involved a defense that the contract was fraudulently induced, from the lack-of-capacity defense in the case before it, on the ground that "[u]nlike a claim of fraud in the inducement, which can be directed at individual provisions in a contract, a mental capacity challenge can logically be directed only at the entire contract." (*Id.* at p. 1273, fn. omitted; see *Mayorga v. Ronaldo* (D.Nev. 2020) 491 F.Supp.3d 840, 853-854 [following *Spahr* and disagreeing with *Primerica*]; *Amirmotazedi v. Viacom, Inc.* (D.D.C. 2011) 768 F.Supp.2d 256, 262-263 [following *Spahr* and collecting cases holding that mental capacity defense and other defenses challenging signatory authority must be resolved by courts]; *In re Morgan Stanley & Co., Inc.* (Tex. 2009) 293 S.W.3d 182, 189, fn. omitted [summarizing cases disagreeing with *Primerica*, stating "*Primerica* has been roundly criticized, and we [are] aware of no other court that has followed its reasoning, including the Fifth Circuit"]; see also *Burgoon v. Narconon of Northern California* (N.D.Cal. 2015) 125 F.Supp.3d 974, 982-983 [concluding the issue of whether the plaintiffs lacked capacity to enter contracts containing an arbitration clause was for the court to decide].)[16] Appellants do not address these cases contrary to

---

lacked the mental capacity to assent." (*Ibid.*, citing *Spahr*, *supra*, 330 F.3d 1266.)

[16] Legal commentators have also criticized the *Primerica* decision. (See, e.g., Huber, *The Arbitration Jurisprudence of the Fifth Circuit: Round IV* (2007) 39 Tex. Tech L.Rev. 463, 476 [*Primerica* "drew no distinction between contract defenses and contract formation" but "[t]he sensible response, as noted by the Supreme Court, is that in the absence of contract formation there

*Primerica*, only briefly mentioning *Spahr* without any discussion.[17]

Third, *Primerica* is distinguishable from this case in that the arbitration clause was embedded within the parties' broader agreement. (*Primerica*, *supra*, 304 F.3d at p. 471.) Here, in contrast, the arbitration agreement was a stand-alone contract,

---

can be no basis for arbitration"]; Rau, *Everything You Really Need to Know About "Separability" in Seventeen Simple Propositions* (2004) 14 Am. Rev. Int'l Arb. 1, 15-16 [result in *Primerica* not compelled by *Prima Paint*, which "preserves for the courts any claim at all that necessarily calls an agreement to arbitrate into question" (italics omitted); "[s]omeone lacking the requisite mental capacity to contract cannot, I dare say, assent to arbitrate anything at all"].)

[17] Appellants suggest that *Sandoval-Ryan v. Oleander Holdings LLC* (2020) 58 Cal.App.5th 217 supports *Primerica*. This is not accurate. The court in *Sandoval-Ryan* did not reach the issue of whether the plaintiff's challenge to the arbitration provision could be delegated to the arbitrator because it concluded the parties' arbitration agreement did not clearly and unmistakably provide for the arbitrator to decide the issue. (*Id.* at p. 225.) Appellants cite *Lefoldt v. Horne, L.L.P.* (5th Cir. 2017) 853 F.3d 804, but that case did not involve a claim of lack of capacity. Appellants also cite *Goldberg v. C.B. Richard Ellis, Inc.* (D.S.C. Dec. 14, 2012) 2012 WL 6522741, but that case also did not involve a lack-of-capacity defense and the plaintiff's challenge regarding the signing of the parties' agreement did not involve the separate arbitration agreement, which the plaintiff did not challenge. (*Id.* at p. *4.) Finally, appellants cite *DiGiacomo v. Ex'pression Center for New Media, Inc.* (N.D.Cal. Sep. 15, 2008) 2008 WL 4239830, which also did not involve a capacity defense. (See *id.* at p. *5, fn. omitted ["Plaintiff does not go so far as to assert that he lacks the mental capacity to contract"].)

24

and was expressly not a part of the contract relating to Thomas's admission to Country Villa.

We decline to follow *Primerica.* As a threshold matter, we are not bound by holdings of the lower federal courts. (*Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1715-1716.) Moreover, the holding is contrary to our Supreme Court's holding in *Rosenthal* and in *Primerica* the court applied *Prima Paint*, which involved claims of fraudulent inducement, to the fundamentally different defense of lack of capacity, without taking into account the important distinctions between the claims. While it is possible for a fraudulent inducement claim to focus on specific portions of an agreement (see, e.g., *Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street*, *supra*, 35 Cal.3d at pp. 324 [plaintiff sought to avoid arbitration as required by lease based on allegations it was fraudulently induced to enter the lease by false representations that the building's air-conditioning worked]), a lack-of-capacity defense necessarily implicates the entire agreement. In other words, a party who has been fraudulently induced to enter an agreement can still knowingly agree to arbitration, while a party who lacks capacity to enter an agreement cannot knowingly agree to arbitration. The situation in this case, where the overall contract at issue addresses only arbitration, illustrates this point starkly—it is hard to imagine a scenario in which Thomas lacked capacity to enter the overall arbitration agreement but had capacity to agree to have an arbitrator decide whether or not he had such capacity.

In conclusion, Thomas's defense to the petition, that he lacked mental capacity to enter into the arbitration agreement, was an issue that could not be delegated to the arbitrator because

25

it was a challenge to the very existence of the arbitration agreement, including the delegation provision.  Therefore, the trial court properly addressed Thomas's defense.

## C.  The Trial Court Properly Ruled that Thomas Did Not Have Mental Capacity to Enter the Arbitration Agreement

### 1.  *Legal standards governing claims of lack of capacity to enter a contract.*

Under Civil Code section 1556, "persons of unsound mind" are deemed not capable of contracting.[18]  "The basic starting point for any mental capacity determination is the Due Process in Competence Determinations Act found in Probate Code sections 810 to 813, 1801, 1881, 3201, and 3204 (the Act).  In 1995, the Legislature created the Act to clarify the legal capacity of a person who has a mental or physical disorder."  (*In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 640; see *Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 728 ["[Prob. Code, §§] 810 to 813 set

---

[18] Civil Code section 38 provides that "[a] person entirely without understanding has no power to make a contract of any kind, but the person is liable for the reasonable value of things furnished to the person necessary for the support of the person or the person's family."  Under Civil Code section 39, subdivision (a), a contact entered by a person who is "of unsound mind, but not entirely without understanding," and who has not been judicially declared of unsound mind, is subject to rescission.  (See *Smalley v. Baker* (1968) 262 Cal.App.2d 824, 832 [under California law "a party is entitled to rescission of a contract if, when he entered into the contract, he was not mentally competent to deal with the subject before him with a full understanding of his rights"].)

out the standard for capacity to make various kinds of decisions, transact business, and enter contracts"].)

Probate Code section 810 sets forth the legislative findings supporting the Act, including that "[f]or purposes of [the Act], there shall exist a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions." (Prob. Code, § 810, subd. (a); see *Sterling v. Sterling* (2015) 242 Cal.App.4th 185, 195 [Prob. Code, "[§] 810 sets forth a rebuttable presumption of competency"].)

Probate Code section 811 in turn sets forth the type of evidence a court should consider in making a determination whether a person has capacity. Specifically, it provides that "[a] determination that a person is of unsound mind or lacks the capacity to make a decision or do a certain act, including, but not limited to, the incapacity to contract, to make a conveyance, to marry, to make medical decisions, to execute wills, or to execute trusts, shall be supported by evidence of a deficit in at least one of the following mental functions. . . : [¶] (1) Alertness and attention[;] [¶] . . . [¶] (2) Information processing[;] [¶] . . . [¶] (3) Thought processes[;] [¶] . . . [¶] (4) Ability to modulate mood and affect." (*Id.*, subd. (a); see *Sterling v. Sterling*, *supra*, 242 Cal.App.4th at p. 195 ["[Prob. Code, §] 811 identifies grounds for finding incompetency including ability to remember, ability to modulate mood, and ability to process information"].) Probate Code section 811 provides examples of each type of deficit. (*Id.*, subd. (a).)

Under the Act, a deficit in one of the mental functions listed "may be considered only if the deficit, by itself or in combination with one or more other mental function deficits,

27

significantly impairs the person's ability to understand and appreciate the consequences of his or her actions with regard to the type of act or decision in question." (Prob. Code, § 811, subd. (b).) Thus, "[t]here must be a causal link between the impaired mental function and the issue or action in question." (*In re Marriage of Greenway*, *supra*, 217 Cal.App.4th at p. 640.) In considering the causal link, courts may take into account "the frequency, severity, and duration of periods of impairment." (Prob. Code, § 811, subd. (c).) "The mere diagnosis of a mental or physical disorder shall not be sufficient in and of itself to support a determination that a person is of unsound mind or lacks the capacity to do a certain act." (Prob. Code, § 811, subd. (d).)

Probate Code section 812 provides that "[e]xcept where otherwise provided by law, including, but not limited to, Section 813 [regarding capacity to give informed consent to proposed medical treatment] and the statutory and decisional law of testamentary capacity, a person lacks the capacity to make a decision unless the person has the ability to communicate verbally, or by any other means, the decision, and to understand and appreciate, to the extent relevant, all of the following:

"(a) The rights, duties, and responsibilities created by, or affected by the decision.

"(b) The probable consequences for the decisionmaker and, where appropriate, the persons affected by the decision.

"(c) The significant risks, benefits, and reasonable alternatives involved in the decision."

Finally, Civil Code section 39, subdivision (b) provides that "[a] rebuttable presumption affecting the burden of proof that a person is of unsound mind shall exist for purposes of this section if the person is substantially unable to manage his or her own

28

financial resources or resist fraud or undue influence. Substantial inability may not be proved solely by isolated incidents of negligence or improvidence."

>2. *Substantial evidence supports the trial court's finding that Thomas lacked mental capacity to enter the arbitration agreement.*

The trial court's finding that Thomas did not have capacity to enter the arbitration agreement is supported by substantial evidence and is consistent with the criteria set forth in the Act.

The evidence before the trial court shows that medical staff at Country Villa, including a doctor, concluded that Thomas had a cognitive deficit that affected his ability to make decisions in his own best interest, and that Country Villa staff looked to Thomas's sister, Carlise, to make medical decisions on his behalf. This evidence reasonably supports the inference that Thomas had at least one of the deficits listed in Probate Code section 811, subdivision (a), namely, difficulty with "[i]nformation processing." (*Id*., subd. (a)(2).) As examples of deficits of this type, Probate Code section 811, subdivision (a)(2) lists "[a]bility to reason using abstract concepts," "[a]bility to plan, organize, and carry out actions in one's own rational self-interest," and "[a]bility to reason logically." The evidence also reasonably supports the inference that this deficit "significantly impair[ed]" Thomas's ability to understand that he was being asked to voluntarily agree to resolve any disputes that might arise regarding his treatment through arbitration instead of court, and to appreciate the consequences of such an agreement. (*Id*., subd. (b).)

The court found especially "persuasive" the record of an evaluation by a Country Villa doctor on August 2, 2020, two days before Thomas purportedly executed the arbitration agreement.

29

According to the record, the doctor concluded that Thomas "does **NOT** have the capacity to understand and make decisions."  That same day, in a licensed personnel weekly progress note, Country Villa staff wrote "client is unable to sign & make decisions for himself due to cognitive status," and indicated that Carlise was contacted to discuss Thomas's treatment plan.  As is shown by Carlise's declaration and medical records from Country Villa, staff at Country Villa contacted Carlise to obtain approval to admit Thomas to the facility and to approve various aspects of treatment.  The court could reasonably infer from this evidence that Thomas was not able to understand and process information well enough to be relied upon to make decisions about his own well-being.

The trial court also could rely on the declaration of Carlise, Thomas's sister, wherein she stated, "[d]ue to my brother's cognitive deficit and mental retardation, it would have been impossible for my brother at that time to have understood what an arbitration agreement was or what he was signing."

The medical records relied upon by appellants do not contradict the foregoing evidence.  Appellants relied on records showing that before, on and after the day he purportedly signed the arbitration agreement Thomas was evaluated to be "alert and oriented" by various staff at Country Villa.  However, even if Thomas was "alert and oriented," he still could have had difficulties understanding concepts or making decisions in his own best interest.  Notably, "[a]lertness and attention" is a separate type of deficit under Probate Code section 811, subdivision (a)(1).

Appellants also relied on two documents signed by Thomas which they claim show he did not lack capacity.  One was a

30

medical form signed by Thomas in January 2019, in which he set out his wishes for life-sustaining treatment. The other was the medical power of attorney form Thomas signed in September 2010. Given that Thomas signed both of these documents more than a year before he was admitted to Country Villa (10 years earlier in the case of the medical power of attorney form) the trial court did not err in giving them little weight in deciding the question before him, i.e., did Thomas have mental capacity when he purportedly signed the arbitration agreement in 2020, when he was at Country Villa.[19]

Appellants argue that the trial court's finding Thomas lacked capacity to enter the arbitration agreement is undermined by the claim in Thomas's reply brief in support of his motion for a preference in trial setting that he had capacity to proceed in his lawsuit. This argument is unavailing for two reasons. First, the claim was argument and not evidence.[20] Second, a suggestion that Thomas had "capacity" to assist his attorneys in a lawsuit does not necessarily show he had capacity to enter a contract on his own, in light of the evidence that the court relied upon to

---

[19] Thomas signed the medical power of attorney form and the 2019 medical form with his full name, which suggests that the mark he made on the arbitration agreement—"WT"—was not his standard signature.

[20] As is noted above, while the reply brief states that Thomas executed a declaration in support of his opposition to the petition to compel arbitration, it does not appear that any declaration by Thomas was actually submitted.

reach his finding that Thomas lacked capacity in early August when he was admitted to Country Villa.[21] [22]

Appellants contend that the trial court based its decision on Carlise's report of Thomas's diagnosis and the existence of the medical power of attorney form instead of a finding that Thomas

---

[21] According to the complaint, Thomas was represented in the lawsuit by Carlise as his attorney-in-fact. A person's status as an attorney-in-fact does not give them the authority of a guardian ad litem. (*In re Marriage of Caballero* (1994) 27 Cal.App.4th 1139, 1143.) In *In re Marriage of Caballero*, the court concluded that "in the case of an insane or incompetent person, it appears incumbent upon the court to appoint a guardian ad litem *whenever* the need for one is brought to the court's attention." (*Id.* at p. 1149.) In its written decision dated January 29, 2021, the trial court indicated that Thomas was represented in the case by a guardian ad litem, but the record does not contain an order appointing a guardian ad litem.

[22] Appellants contend, without any analysis or authority, that based on the claim in the reply brief Thomas should be estopped to claim he lacks capacity. To the extent appellants argue that Thomas should be judicially estopped to argue he lacked capacity to enter the arbitration agreement, their argument fails. For the doctrine of judicial estoppel to apply Thomas must have been " ' "successful in asserting the first position." ' " (*Jogani v. Jogani* (2006) 141 Cal.App.4th 158, 169.) Here, Thomas was not successful in asserting the first position, as the trial court denied his motion for a preference in trial setting in large part based on its finding that Thomas would not be able to assist his counsel. In addition, " 'judicial estoppel is an equitable doctrine, . . . its application, even where all necessary elements are present, is discretionary.' " (*Id.* at p. 170.) The trial court did not abuse its discretion in failing to estop Thomas from claiming he lacked capacity to enter the arbitration agreement.

actually lacked capacity. This misrepresents the trial court's decision. The trial court did not rely on Thomas' diagnosis or the medical power of attorney form, but instead relied on evaluations by Country Villa's own staff that Thomas lacked the capacity to understand and make decisions, and on evidence, in the form of Carlise's declaration and Country Villa records, that staff at Country Villa contacted Carlise to obtain consent to medical treatment because they considered Thomas to be incapable of making decisions on his own. As is discussed above, this evidence more than amply supports the conclusion that Thomas had a deficit in "[i]nformation processing" under Probate Code section 811, subdivision (a)(2), which interfered with his ability to comprehend a legally technical document like the arbitration agreement and to appreciate the consequences of signing such a document. (See *In re Caden C.* (2021) 11 Cal.5th 614, 640 [under the substantial evidence standard, a trial court's "[factual] determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence' "].)

We conclude that the trial court properly addressed Thomas's defense to the petition that he lacked capacity to enter the arbitration agreement, and that there was substantial evidence supporting the trial court's conclusion Thomas lacked such capacity. Therefore, the trial court properly denied appellants' petitions to compel arbitration.

## DISPOSITION

We affirm the trial court's orders denying appellants' petitions to compel arbitration.  Thomas is awarded costs on appeal.

NOT TO BE PUBLISHED


KELLEY, J.*


We concur:


ROTHSCHILD, P. J.


BENDIX, J.

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.